**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4707-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHNNY BE JONES III, a/k/a
JOHNNY BE JONES, JOHNNY B.
JONES, JOHNNY BERNARD
JONES, and JOHNNY BERNARD
JONES III,

     Defendant-Appellant.

_____

Argued October 29, 2019 – Decided  December 9, 2019

Before Judges Fisher, Gilson, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-05-1287.

Jack L. Weinberg, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jack L. Weinberg, on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Johnny B. Jones, III of the first-degree murder of D.R., N.J.S.A. 2C:11-3(a)(1) and (2).[1] The jury also convicted defendant of three related crimes of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1) and (2); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d).

On the murder conviction, defendant was sentenced to sixty years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant was also sentenced to a concurrent term of eighteen months in prison for unlawful possession of a weapon. His other two convictions were merged. Defendant appeals his convictions and sentence. We affirm.

I.

The murder victim, D.R., worked as a dancer at a strip club in Irvington known as the Dollhouse. In the early morning hours of December 3, 2011, D.R. left the club with two men. Approximately two months later, in January 2012,

---

[1] We use initials to refer to the victim and certain witnesses to protect their privacy interests.

A-4707-16T4

her body was discovered under a mattress by employees of the City of East Orange when they were cleaning up a dump site.

An autopsy revealed that D.R. had been stabbed forty-two times and she had eleven incision wounds, including a large horizontal incision wound across her neck. The medical examiner concluded that D.R. died as a result of wounds to her chest and neck.

Following the discovery of D.R.'s body, law enforcement personnel began an investigation. Sergeant Thomas McEnroe, a New Jersey State Police officer assigned to the Essex County Homicide Task Force, was the lead detective on the case. McEnroe and other detectives interviewed several people who worked at the Dollhouse. Those individuals included J.J., the bartender, G.C., the general manager, and D.P., the deejay. All of those witnesses identified defendant as one of two men who had been at the Dollhouse on December 2 and 3, 2011.

J.J. also gave McEnroe a cell number, which defendant had given to J.J. on December 3, 2011, while they were hanging out together at the Dollhouse. J.J. and D.P. also told detectives that defendant had made a shout out on D.P.'s microphone, claiming that his brother had just beaten a murder conviction in Georgia, and they were celebrating.

In investigating defendant's cell number, detectives learned that defendant had resided for a time in East Orange. Accordingly, in March 2012, detectives canvassed the area around the apartment where defendant had been living and showed people his photograph. A few days later, Detective McEnroe received a call. The caller identified himself as defendant and asked why McEnroe was showing his picture around. McEnroe responded by telling defendant that he was investigating the disappearance and murder of a dancer and that he wanted to come to Georgia to talk to defendant. Defendant sighed and hung up.

McEnroe also contacted law enforcement officials in Georgia and learned that two individuals – C.D. and C.F. – had recently beaten murder charges in Georgia. Detectives thereafter determined that C.D. had been in Georgia on the date of the murder.

Initially, detectives could not account for the location of C.F. on the date of the murder. Accordingly, they showed pictures of defendant and C.F. to J.J. and D.P. and those witnesses identified both defendant and C.F. as the men who had been at the Dollhouse on December 2, 2011. Later, however, McEnroe came to believe that C.F. had a strong alibi that he was in Georgia on the date of the murder. McEnroe based that assessment on his review of C.F.'s work and bank records, and information from C.F.'s co-workers.

4

After further investigation, law enforcement personnel identified defendant, and a co-defendant, Brian Love, as the two principal suspects, and collected DNA samples from both. A comparison of those DNA samples to DNA taken from D.R. and an item found near D.R.'s body implicated both defendant and Love. In that regard, defendant's and Love's DNA matched DNA taken from clippings from D.R.'s fingernails. Defendant's DNA also matched a sample taken from a gray sweater that had been found on top of D.R.'s body.

Defendant and Love were thereafter charged with the murder of D.R. and related weapons offenses. Love pled guilty to second-degree manslaughter. In his plea agreement, he agreed to provide testimony against defendant in exchange for a recommended sentence of ten years in prison subject to NERA.

At trial, the State presented testimony from a number of witnesses, including J.J., D.P., Love, and Detective McEnroe. J.J. testified that defendant and Love arrived at the Dollhouse on the evening of December 2, 2011. Defendant then started drinking alcohol and, according to J.J., defendant spent over $1000 on liquor and lap dances. J.J. also testified that defendant purchased three bottles of liquor consisting of two bottles of tequila and a bottle of vodka. She went on to testify that she spoke with defendant before she left the

Dollhouse in the early morning hours of December 3, 2011, and defendant appeared to be alert and was able to put his cell number into her cell phone.

D.P. testified that he had worked as the deejay at the Dollhouse on December 2, 2011. He recalled seeing defendant and Love arrive at the Dollhouse. D.P. also testified that defendant entered his booth and asked to make a shout out on his microphone. Defendant then shouted out that he and his brother were from down south, his brother had just beaten a murder charge, and they were celebrating. D.P. also testified that he observed defendant purchase at least one bottle of liquor, but when he spoke with defendant, defendant was not slurring his words nor was his body swaying.

The State's main witness at trial was Love, who testified in detail as to events surrounding D.R.'s murder. He explained that he had known defendant since 2008, and both men were union ironworkers. On the afternoon of December 2, 2011, Love and defendant had received and cashed their union annuity checks. Defendant and Love then went to the Dollhouse where they remained until approximately 2 a.m. on December 3, 2011. When the Dollhouse closed, defendant, Love, and D.R. left together to drive to D.R.'s home. Love drove defendant's car and explained that he did not feel that defendant was fit to drive at that time. In that regard, Love testified that defendant had been drinking

6

at the Dollhouse. Love also explained that he did not have any trouble understanding defendant's speech and that defendant appeared to be steady on his feet. Love elaborated that he believed defendant was "too intoxicated to drive," but he "wouldn't say he was drunk."

In the car, Love was driving, D.R. was in the front passenger seat, and defendant was in the back seat. While they were driving, defendant asked D.R. to move to the back. D.R. refused and an argument and struggle ensued. Thereafter, defendant grabbed D.R., pulled out a knife, and repeatedly stabbed D.R. Defendant then slit D.R.'s throat.

Love went on to testify that he and defendant then drove to defendant's apartment. Both Love and defendant showered and changed their clothes. Defendant and Love then drove D.R.'s body to an abandoned area and defendant put D.R.'s body under a mattress.

On February 3, 2017, after hearing all of the evidence, a jury convicted defendant of all charges, including first-degree murder. Nearly two months later, on March 29, 2017, defendant filed a motion for a new trial. The trial court denied that motion finding it was time-barred and lacked merit.

II.

Defendant appeals his convictions and sentence and makes six arguments, which he articulates as follows:

> POINT I: THE COURT DEPRIVED THE DEFENDANT OF A FAIR TRIAL WHEN IT DENIED THE DEFENDANT'S REQUEST TO CHARGE VOLUNTARY INTOXICATION IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 9 OF THE NEW JERSEY CONSTITUTION.
>
> POINT II: THE TESTIMONY BY DETECTIVE MCENROE CONCERNING THE VALIDITY OF [C.F.]'S ALIBI RESULTING IN THE DISMISSAL OF CHARGES AGAINST HIM VIOLATED THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION THEREBY DEPRIVING HIM OF A FAIR TRIAL. THE TESTIMONY CONSTITUTED IMPERMISSIBLE HEARSAY TESTIMONY AND WAS NOT ADMISSIBLE AS A STATE OF MIND EXCEPTION TO THE HEARSAY RULES.
>
> POINT III: THE PROSECUTOR'S COMMENTS IN SUMMATION CONSTITUTED PROSECUTORIAL MISCONDUCT DEPRIVING THE DEFENDANT OF A FAIR TRIAL.
>
> POINT IV: THE COURT'S FAILURE TO INCLUDE IN THE SPECIFIC CHARGES THE FULL DEFINITIONS OF THE MENTAL STATES OF PURPOSEFUL AND KNOWING CONDUCT CONTITUTES PLAIN ERROR AS THE CHARGES DID NOT PROPERLY CONVEY A COMPLETE

8

UNDERSTANDING THE CHARGES AGAINST THE DEFENDANT.

POINT V: THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO R. 3:20-1.

POINT VI: THE COURT IMPOSED AN EXCESSIVE SENTENCE WHICH DID NOT TAKE INTO CONSIDERATION ALL APPROPRIATE CODE SENTENCING GUIDELINES.

Having reviewed these arguments in light of the record and law, we reject each of defendant's arguments and affirm. We will address the arguments in the order they were presented by defendant.

A.    The Request to Charge Voluntary Intoxication

A conviction of murder requires proof that defendant acted purposely or knowingly. N.J.S.A. 2C:11-3(a)(1), (2). "To act purposely requires a conscious objective to engage in conduct or to cause the result of conduct, while to act knowingly requires awareness of the nature of the conduct involved." State v. Sette, 259 N.J. Super. 156, 170 (App. Div. 1992) (citing N.J.S.A. 2C:2-2(b)(1), (2)).

Self-induced intoxication can be a defense to a purposeful or knowing crime. N.J.S.A. 2C:2-8(a); State v. Cameron, 104 N.J. 42, 52-53 (1986). "Self-induced intoxication can reduce the offense of purposeful or knowing murder to

9

manslaughter or aggravated manslaughter."  State v. Mauricio, 117 N.J. 402, 418 (1990) (citing State v. Warren, 104 N.J. 571, 577 (1986)).

The statutory definition of intoxication is "a disturbance of mental or physical capacities resulting from the introduction of substances into the body." N.J.S.A. 2C:2-8(e).  To establish intoxication as a defense, there must be evidence that defendant's faculties were so "'prostrated' that he or she was incapable of forming an intent to commit the crime."  Mauricio, 117 at 418-19 (quoting Cameron, 104 N.J. at 52-53).  That is a high standard and "it is not the case that every defendant who has had a few drinks may successfully urge the defense."  Cameron, 104 N.J. at 54 (alteration in original omitted) (quoting State v. Stasio, 78 N.J. 467, 495 (1979) (Pashman, J., concurring and dissenting)). "The mere intake of even large quantities of alcohol will not suffice."  Stasio, 178 N.J. at 495.  "Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he [or she] been sober."  Ibid.

The defense of intoxication does not automatically go to a jury.  Instead, the trial judge must first determine whether the evidence would permit a jury to conclude "that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime."  Mauricio, 117 N.J. at 418-

19 (quoting Cameron, 104 N.J. at 56). If not, there is no warrant for the charge. Cameron, 104 N.J. at 57. In evaluating whether a defendant has satisfied the "prostration of faculties" test, courts consider factors such as: "'(1) the quantity of alcohol consumed; (2) the period of time during which the alcohol was consumed; (3) the actor's conduct; (4) [a] noticeable odor of alcohol; (5) the results of blood alcohol content tests; and (6) the defendant's ability to recall relevant facts.'" State v. R.T., 205 N.J. 493, 508 (2011) (Long, J., concurring) (quoting Cameron, 104 N.J. at 56).

The trial judge in this case denied defendant's request for a voluntary intoxication charge, finding that there was no evidence that defendant could not have acted purposely or knowingly. Instead, the trial judge concluded that the evidence demonstrated only that defendant had consumed alcohol and that he was under some influence from the alcohol. Ibid.

Having reviewed the evidence presented at the trial, we conclude that the trial judge correctly denied defendant's request for a voluntary intoxication jury charge. Several witnesses, including J.J., D.P., and Love testified that they observed defendant purchasing and consuming alcohol. Those same witnesses, however, were uncertain as to how much alcohol defendant consumed. Significantly, all three of those witnesses testified that throughout the evening,

defendant appeared alert, able to participate in and understand conversations, and steady on his feet. Moreover, Love testified that when he chose to drive, he believed defendant was "too intoxicated to drive," but that he would not describe defendant as "drunk."

Furthermore, defendant's behavior showed that he was capable of forming the necessary state of mind to commit murder. Love testified that defendant grabbed and restrained D.R. and then repeatedly stabbed her before cutting her throat. Love went on to testify that defendant thereafter apologized to Love for his actions. Shortly after the murder, defendant took a shower, changed his clothes, and took actions to dispose of D.R.'s body. None of that evidence suggests a prostration of defendant's faculties.

There was no evidence of defendant's blood-alcohol content. Instead, defendant relies on the fact that the medical examiner found that D.R. had a blood-alcohol content of approximately .23. We agree with the trial judge that the victim's blood-alcohol content does not establish that defendant was intoxicated to the point that his faculties were prostrated. While there was testimony that the victim drank with defendant during the course of the evening, there was no testimony that they drank the same quantity of alcohol nor was there any evidence that alcohol would affect each of them the same way.

12

In short, while there was evidence that defendant had been drinking before the murder, that evidence did not provide a basis for a jury to reasonably conclude that defendant's faculties were so prostrated that he was incapable of acting purposely and knowingly in committing the murder. Consequently, defendant was not entitled to a voluntary intoxication charge.

B.    The Testimony by Detective McEnroe

Defendant argues that the trial court admitted hearsay that violated his confrontation right when it permitted Detective McEnroe to testify as to C.F.'s alibi. We accord "'substantial deference to a trial court's evidentiary rulings.'" State v. Outland, 458 N.J. Super. 357, 363-64 (App. Div. 2019) (quoting State v. Morton, 155 N.J. 383, 453 (1998)). Accordingly, we will uphold the trial judge's rulings "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016).

Our Supreme Court has addressed defendant's right to confront witnesses in the context of a detective's testimony regarding the reason certain actions occurred during an investigation. See State v. Bankston, 63 N.J. 263, 265-68 (1973). In Bankston, a detective testified that before arresting Bankston, "the officers had been talking to an informer and that based on information received they went to [a] tavern," with a description of Bankston's clothing, and then

found Bankston at the tavern in possession of narcotics. Id. at 266. The Court held that the hearsay rule does not prevent an officer from testifying that he or she took an action based "upon information received," but that "when the officer becomes more specific by repeating what some other person told him [or her] concerning a crime by the accused the testimony violates the hearsay rule . . . . [and] the accused's Sixth Amendment right to be confronted by the witnesses against him." Id. at 268-69.

The key is whether the hearsay testimony creates an "inescapable inference" that law enforcement received information from an unknown source that implicates defendant. Branch, 182 N.J. at 350 (citing Bankston, 63 N.J. at 268-69). That is, "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." Ibid. (citing Bankston, 63 N.J. at 268-69).

Defendant relies on State v. Frisby, 174 N.J. 583 (2002), to argue that Detective McEnroe could not testify to the hearsay statements made by C.F.'s co-workers and contained in C.F.'s work records because the non-testifying witnesses exculpated C.F. as a suspect, which, in turn, inculpated defendant. We reject this argument.

A-4707-16T4

Detective McEnroe's testimony explained why C.F. was not charged. In that regard, while investigating D.R.'s murder, C.F. became a suspect because he recently had been acquitted of murder charges in Georgia and defendant had given a shout out about his brother beating a murder charge. At trial, Detective McEnroe explained that law enforcement personnel investigated C.F., but found that he had a strong alibi that he was in Georgia at the time of the murder.

Critically, however, the testimony concerning C.F. did not inculpate defendant. That testimony explained why C.F. was no longer a suspect, but it did not thereby indicate that defendant was the murderer. Indeed, the testimony did not mention defendant. The evidence against defendant came from other, independent, testimony and DNA analysis. In that regard, there was strong evidence offered against defendant on the murder charge, including DNA analysis and testimony from Love. In short, we find no basis to reverse the jury verdict based on the admission of Detective McEnroe's testimony concerning C.F.

C.    Comments by the Prosecutor in Summation

Defendant contends that the prosecutor engaged in misconduct when, during her summation, she commented on his right to remain silent, referred to information that was not supported by evidence, and appealed to the jury's

passions. Defendant argues that such misconduct deprived him of a fair trial and that we should reverse the jury verdict. We disagree.

Defense counsel did not object to any of the prosecutor's comments at trial, and thus we review the comments for plain error. R. 2:10-2; State v. Feal, 194 N.J. 293, 312 (2008). "Plain error must be 'sufficient [to raise] a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" Feal, 194 N.J. at 312 (alteration in original) (citation omitted) (quoting State v. Daniels, 182 N.J. 80, 102 (2004)).

Prosecutors are afforded wide latitude during summations. State v. R.B., 183 N.J. 308, 330 (2005). They must, however, "confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001).

In evaluating a claim of prosecutorial misconduct, we apply a two-part test: (1) whether the comments amounted to misconduct and, if so: (2) whether the prosecutor's conduct justifies reversal. State v. Wakefield, 190 N.J. 397, 446 (2007). Reversal of a defendant's conviction is not justified unless the prosecutor's comments were "'so egregious that [they] deprived the defendant of a fair trial.'" State v. Harvey, 151 N.J. 117, 216 (1997) (quoting State v. Ramseur, 106 N.J. 123, 322 (1987)). Accordingly, the prosecutor's conduct

16

must have been "'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense." Wakefield, 190 N.J. at 438 (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). "[N]ot every prosecutorial misstatement warrants a new trial." Feal, 194 N.J. at 312.

Defendant first objects to a comment the prosecutor made concerning a call defendant made to Detective McEnroe. Specifically, the prosecutor detailed that defendant had called McEnroe to ask why the police were showing his photograph around the apartment where he had lived while in New Jersey. McEnroe responded that he was investigating the murder of a dancer and that he wanted to speak with defendant about the murder. The prosecutor then stated:

> And the defendant, learning for the first time that he has been connected to this murder, reacts the same way he reacted throughout this case, putting some distance between himself and judgment for his actions. In the face of this accusation, he sighs and hangs up.

On appeal, defendant argues that this comment violated his right against self-incrimination. Defendant's sigh and ending the phone conversation, however, did not occur when he was in custody. Moreover, the trial court held a pre-trial Rule 104 hearing and ruled that defendant's nonverbal response to the murder accusation was admissible. Defendant had initiated the phone call and

his statements to McEnroe were voluntary.  See State v. O'Neill, 193 N.J. 148, 167 (2007); State v. P.Z., 152 N.J. 86, 102 (1997).  Consequently, the prosecutor's comments did not constitute misconduct.[2]

Next, defendant argues that the prosecutor implicitly condemned him for invoking his right to remain silent when she praised Love for cooperating and confessing to his involvement in the murder.  Read in context, however, the prosecutor's comments were not directed at defendant's silence; they were directed at supporting the credibility of Love.  "The prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness' credibility."  State v. Waldon, 370 N.J. Super. 549, 560 (App. Div. 2004).

The prosecutor did not commit misconduct in comparing Love's actions to defendant's actions.  The comments were based on evidence presented at trial and the prosecutor's comments primarily went to supporting the credibility of Love.  Indeed, defense counsel had spent substantial time in his closing

---

[2]  Defendant also suggests that the prosecutor's comparison of defendant's behavior during his 2012 phone call with the "way he [had] reacted throughout this case" constituted an improper comment.  Defendant did not object to this comment at trial.  Moreover, "the weight of the State's evidence [is] such as to render [the error] relatively harmless."  State v. Schumann, 111 N.J. 470, 477 (1988) (citation omitted).  Thus, this comment does not warrant a reversal.

A-4707-16T4

attacking the credibility of Love. "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000) (citing State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)).

Defendant also contends that the prosecutor improperly referenced information not adduced at trial. Specifically, he challenges three comments made by the prosecutor: (1) that the victim was fearful of something and did not give Love directions to where she actually lived; (2) that defendant callously took off her body the money he had given D.R. at the bar, calling it "one final act of disgrace before he leaves her there to rot"; and (3) that the investigation went up and down the East Coast.

As to the first comment, there is no evidence in the record to support the prosecutor's comment that the victim was not directing Love and defendant to her home. Instead, Love testified that D.R. was giving him directions to her home. This comment, however, does not constitute reversible error. The trial court properly instructed the jury that their recollection of the evidence was what should guide them and that summations of counsel were not evidence. That instruction, combined with the lack of an objection from defense counsel, establishes that this comment does not warrant a reversal of the jury verdict.

19

The prosecutor's comments concerning defendant taking the money from D.R. after she was murdered was a fair comment based on the evidence at trial. At trial, there was testimony that defendant had paid the victim over $500 while they were at the Dollhouse. There was also testimony that when the victim's body was discovered, she only had a $20 bill on her body. Accordingly, the prosecutor's statement fell within the scope of fair comment. See State v. Cole, 229 N.J. 430, 457 (2017) (recognizing prosecutors have considerable leeway in closing arguments if their comments are reasonably related to the scope of the evidence).

The prosecutor's third comment was to the effect that law enforcement conducted their investigation in this case along the entire East Coast. There was evidence at trial that the investigation was conducted in New Jersey, Georgia, and Florida, where defendant was finally arrested. As such, the prosecutor's comment was supported by the evidence and was a fair comment.

Finally, defendant contends that the prosecutor deprived him of a fair trial by appealing to the passions of the jury. He references the prosecutor's argument to the jury that the victim had a right to her life and defendant had no right to take her life and throw her out "like she was garbage."

Viewed in context, the challenged comment regarding the victim's right to life was an appeal for sympathy towards the victim. See State v. Marshall, 123 N.J. 1, 163 (1991). Moreover, that comment "had no bearing on any substantive issue in the case" and, was not proper. Ibid. Nevertheless, the comments "were neither extensive nor inflammatory." Ibid. Thus, the one comment not rise to the level of grounds for a reversal.

D.     The Jury Instruction on Purposeful and Knowing Conduct

Defendant next contends that his conviction should be reversed because the trial court failed to include definitions of purposeful and knowing conduct in the jury charge for each substantive offense. Here, again, defendant did not object to the jury instructions on this ground and, therefore, we again review this issue for plain error. R. 2:10-2.

Correct and appropriate jury charges are essential to a fair trial. State v. Baum, 224 N.J. 147, 158-59 (2016). The court must "'instruct the jury as to the fundamental principles of law which control the case [including] the definition of the crime, the commission of which is basic to the prosecution against the defendant.'" State v. McKinney, 223 N.J. 475, 495 (2015) (alteration in original) (quoting State v. Green, 86 N.J. 281, 288 (1981)).

21

In reviewing jury instructions, we consider the challenged portion of the instruction in the context of the entire charge to determine whether the overall effect was misleading or ambiguous. Id. at 494. In situations where a trial court correctly instructs the jury concerning certain components of the charge, "'[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law.'" Id. at 496 (alteration in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

In charging the jury, the trial court here defined purposeful and knowing conduct. The court then charged the jury on the substantive offenses and referred back to the definition of purposeful and knowing conduct, rather than repeat the definition several times. Taken as a whole, the jury instructions were not in error and certainly not plain error. The jury was clearly instructed on what purposeful and knowing meant under the law. On each of the four substantive charges, the jury was told that they needed to find purposeful or knowing conduct by defendant. The jury was then reminded that they had already been given the definition of purposeful or knowing conduct.

E.    The Motion for a New Trial

Defendant challenges the denial of his motion for a new trial.  We will reverse a trial court's ruling on a motion for a new trial only if "it clearly appears that there was a miscarriage of justice under the law."  R. 2:10-1.

Except for limited grounds not at issue here, a motion for a new trial must be made within ten days of the guilty verdict.  R. 3:20-2.  That ten-day period may not be enlarged by the trial court or by consent of the parties.  R. 1:3-4(c).

Defendant moved for a new trial alleging several trial errors that he claimed resulted in a manifest denial of justice.  The motion, however, was filed nearly two months after the jury verdict.  Consequently, the trial court denied the motion as untimely and because it lacked merit.

Having reviewed defendant's arguments concerning the grounds for a new trial, we discern no error in the denial of that motion.  There is no dispute that the motion was filed late, without justifiable excuse.

F.    Defendant's Sentence

Finally, defendant contends that his sixty-year sentence, subject to NERA, was manifestly excessive.  He also contends that the court should have considered the application of mitigating factor four – that there were substantial grounds tending to excuse or justify his conduct, N.J.S.A. 2C:44-1(b)(4).

A-4707-16T4

We review sentencing decisions under an abuse of discretion standard. State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). We will affirm a trial court's sentence unless "(1) the sentencing guidelines were violated; (2) the finding of aggravating and mitigating factors were not 'based upon competent and credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" Id. at 228 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

The sentencing judge here assessed the aggravating and mitigating factors and made findings, which are supported by the record. The judge then followed the sentencing guidelines. Thus, the judge's findings concerning the aggravating factors and lack of mitigating factor were supported by evidence in the record. The sentence, moreover, does not shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4707-16T4