STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MANUEL ANTONIO MAURICIO,
DEFENDANT–APPELLANT.

Argued March 14, 1989—Decided January 29, 1990.

*Stephen A. Caruso*, Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorneys).

*John J. Scaliti*, Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.*, Attorney General of N.J., attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

In an apparent case of mistaken identity, defendant, Manuel Antonio Mauricio, shot and killed one Gary Rizzo, believing him to be a bouncer who had thrown defendant out of a nightclub shortly before the killing. A jury convicted defendant of knowing and purposeful murder, in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2), and of possession of a sawed-off shotgun, contrary to *N.J.S.A.* 2C:39–3(b). The trial court imposed an aggregate

term of life imprisonment with a thirty-year term of parole ineligibility and monetary penalties totaling $1025.

On his appeal to the Appellate Division, defendant claimed reversible error in the trial court's failure to instruct the jury on passion/provocation manslaughter and on aggravated manslaughter based on an intoxication defense. Defendant also argued that the prosecutor's statements during summation were so erroneously prejudicial as to require reversal. Finally, he asserted that the trial court erred in holding that an exculpatory portion of his out-of-court inculpatory statement was not admissible.

The Appellate Division, in an unreported opinion, rejected all of the foregoing contentions and affirmed the convictions. We granted defendant's petition for certification, 113 *N.J.* 371 (1988), and now reverse.

## I

The Bottom of the Barrel Restaurant and Lounge is located on the east side of Bergenline Avenue between 38th and 39th Streets in Union City. The entrance to the discotheque area, known as the "Parrot Lounge," is at the top of three steps leading from the main door. At the top of the stairway there is a clear plastic partition with a glass door leading into the Lounge. The entrance to the restaurant is at the bottom of three steps descending from the main doorway.

Julio Rodriguez, a bouncer at the Bottom of the Barrel, was stationed at a table just inside the glass door of the Parrot Lounge during the early morning hours of March 16, 1984. At approximately two o'clock a male, later identified as defendant, entered the main door of the establishment and ascended the steps to the Lounge. When he asked Rodriguez the cost of admission, the bouncer told him it was five dollars. Defendant counted his money aloud. As Rodriguez reached for the money, defendant pulled it back and asked, "Five dollars?" Rodriguez answered, "Yes, five dollars." Defendant again started to

count his money aloud, this time speaking in a "yelling-type voice." Deciding that defendant had already had enough to drink, Rodriguez refused to admit him to the bar.

When Rodriguez told defendant to leave, defendant started "rambling." Rodriguez advised him to go home and have some coffee. According to Rodriguez, defendant started to "back away * * * wav[ing] his arms, at which time [Rodriguez] grabbed him by the arms and [ ] escorted him * * * down the three stairs and out the front door." The entire encounter lasted two minutes. Rodriguez could not recall at trial whether he had smelled alcohol on defendant's breath.

Two other people witnessed this first incident. Angela Shannon, a waitress at the Bottom of the Barrel, was seated at a stool inside the Lounge near the glass door. She noticed defendant on the other side of the glass door, talking to Rodriguez. Although she was unable to hear their conversation, she stated that it appeared that Rodriguez was not going to let the defendant into the Lounge. Shannon testified: "So, [Rodriguez] like started to push, and they fell. Both of them fell. Like you could hear a crack like as if one of them hit their head, and then there was commotion. They threw the guy out." On cross-examination, Shannon described the push that Rodriguez had given to defendant as a "nudge." Both men stood up shortly after falling.

The other witness to the first encounter between defendant and the bouncer was Robert Vecchione, general manager of the Bottom of the Barrel, who was closing the restaurant section when he heard some "commotion" upstairs. He approached the main entranceway and asked Rodriguez what had occurred, whereupon Rodriguez told him that he had refused to admit an intoxicated person and had escorted him outside. Vecchione then returned to the restaurant to finish locking up.

Approximately fifteen to twenty minutes later, defendant returned to the Lounge wearing a three-quarter-length overcoat in place of the wine-colored jacket in which he had been clad

earlier. According to Rodriguez, defendant started knocking on the partition with his left hand, all the while keeping his right hand in his coat pocket. Rodriguez, who was standing inside the Lounge, told defendant to leave and asked him to take his hand from his pocket. Defendant ignored his request. Rodriguez then opened the Lounge door "sharply," pinning defendant against the wall. He grabbed defendant by both arms, "put him down the stairs," and pushed him out the main entrance door. Rodriguez did not lock the door behind him.

During this second altercation, Shannon was standing in the stairway vestibule in front of the Lounge door, waiting for a ride home. She testified that defendant walked up the stairs to the partition, and that she called to Rodriguez because she did not know if defendant was going to "punch the glass or what." According to Shannon, defendant was "high * * * but not where he couldn't walk. He wasn't stumbling."

Shannon testified that Rodriguez was "madder the second time" because defendant had "the nerve to come back." When Rodriguez removed defendant again, she saw Rodriguez kick him.

Hearing "a lot of shouting," Vecchione again ran up to the Lounge and asked Rodriguez what had happened. Rodriguez told him that defendant had returned and that an altercation had ensued. Vecchione saw five twenty-dollar bills scattered on the floor near the main door. On learning that the money did not belong to Rodriguez, Vecchione opened the main door to find defendant, who was directly behind the door and had to step back to avoid being hit by it. When asked if the money was his, defendant nodded. Vecchione handed him the money and closed the door. Through a small window in the door, Vecchione noticed that defendant remained standing on the other side.

Still "a little leery," Vecchione again opened the main door minutes later. He walked out onto Bergenline Avenue and saw defendant standing at the northeast corner of Bergenline Ave-

nue and 38th Street. Defendant looked at Vecchione and gestured to him with his "palms upwards * * * [to] stop or go back." Vecchione then went inside to finish closing the restaurant.

The victim, Gary Rizzo, was at the Bottom of the Barrel that same morning. Shannon, who knew Rizzo, said that during both altercations Rizzo was inside the Lounge to her left. Shannon, Vecchione, and Rodriguez all testified that Rizzo had not been involved in any disputes that evening. According to Rodriguez, Rizzo left the bar at 2:35, five minutes after defendant had been thrown out the second time.

At approximately 2:30 a.m., Donald Siero, a friend of Rizzo, was driving southbound on Bergenline Avenue between 39th and 38th Streets. Bergenline Avenue is a well-lit, one-way street in a business district. While stopped at the intersection of 38th Street, Siero observed Rizzo talking to a man, later identified as defendant, on the east side of 38th and Bergenline. Although he could not hear the conversation, he saw Rizzo gesture to the man with his hands "like go away, get away from him."

Siero watched Rizzo cross 38th Street and walk towards Kennedy Boulevard, which runs parallel to Bergenline Avenue. Defendant also crossed 38th Street, but then stopped and knelt behind a grey Ford automobile. As Siero slowly pulled away from the intersection, he stared at defendant. According to Siero, defendant motioned to him as if to say: "[W]hat the hell are you looking at[?]"

Siero drove south on Bergenline until he reached the intersection of 37th Street, then rounded the block to the municipal parking garage behind Bergenline Avenue. He noticed Rizzo standing between two cars in the garage. As Siero entered the lot, he saw defendant shoot Rizzo, who then fell from sight. Defendant fired a second shot. Between shots, Siero heard defendant "laughing very loud." After the second shot, defendant turned towards Siero, who pulled away from the lot and

drove to the intersection of Bergenline and 38th. When he jumped out of his car to look for the police, Siero heard two more shots and continued laughter.

Shortly after the police responded to Siero's call from an emergency-call box on Kennedy Boulevard, Rizzo was pronounced dead from gunshot wounds. Thirteen months later the police arrested defendant for the murder of Gary Rizzo.

The State's theory at trial was that defendant had shot Rizzo because he had mistaken the victim for the bouncer at the Bottom of the Barrel. At the close of all the proofs, defendant seized on the mistaken-identity theory in requesting a manslaughter charge. The basis for the requested charge was that in the heat of passion defendant had killed Rizzo, thinking he was Rodriguez. Defendant also requested an instruction on the lesser-included offense of aggravated manslaughter based on testimony revealing defendant's intoxicated condition. Without discussing any specific evidence that supported its conclusion the trial court denied both requests. The jury convicted defendant of murder and possession of an illegal sawed-off shotgun.

The Appellate Division affirmed. According to the court below the trial court properly refused to charge the jury on passion/provocation manslaughter because the evidence failed to provide a rational basis for that offense. The Appellate Division concluded that defendant's forcible ejection from the restaurant did not "constitute provocation as to 'arouse the passion of an ordinary man beyond the power of his control'" (quoting *State v. King*, 37 *N.J.* 285, 301–02 (1962)). Moreover, the court found that defendant's conduct after the second ejection did not indicate that he had committed the crime in the heat of passion. His behavior demonstrated "an absence of the 'transport of passion' necessary to reduce the crime from murder to passion/provocation manslaughter." Instead, all the events leading up to the shooting of Rizzo pointed to "calculation" on the part of the defendant, whose violent attack on

Rizzo with a deadly weapon the court below viewed as "totally out of proportion to whatever provocation may have arisen by Rodriguez' acts."

The Appellate Division also held that defendant had failed to meet the "prostration of faculties" standard required by this Court for an intoxication defense in *State v. Cameron*, 104 *N.J.* 42 (1986), and that a jury could not have rationally concluded that "defendant's faculties were so prostrated that he could not have formed an intent to purposely or knowingly kill Rizzo."

Defendant's appeal in this Court raises the same four points of error argued below.

## II

### –A–

Defendant contends that the trial court incorrectly refused to instruct the jury on passion/provocation manslaughter. At common law the crime of passion/provocation manslaughter developed as a lesser-included offense of the crime of murder. That development was "a concession to the frailty of man, a recognition that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate." *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 274 (1986) (quoting *State v. Guido*, 40 *N.J.* 191, 209–10 (1963)). Although "a reasonable man who has thus lost control over himself would not kill, yet his homicidal reaction to the provocation is at least understandable." 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 7.10, at 256 (1986) (hereinafter *LaFave & Scott*). The applicability of a passion/provocation manslaughter charge turned on objective criteria. The crime did not cover a killing in which the alleged passion was unreasonable. "[T]here was no purpose to subject others to harm at the hands of those easily provoked and subjectively prone to violence." *State v. Pratt*, 226 *N.J.Super.* 307, 317 (App.Div.1988).

■ *N.J.S.A.* 2C:11–4b(2) codifies the common-law definition of the offense. *State v. Crisantos, supra,* 102 *N.J.* at 271 n. 7. That section defines passion/provocation manslaughter as "[a] homicide which would otherwise be murder \* \* \* [that] is committed in the heat of passion resulting from a reasonable provocation." We have used the common-law definition in applying that provision:

> Voluntary manslaughter is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off.
>
> [*Crisantos, supra,* 102 *N.J.* at 274 (quoting *State v. Guido, supra,* 40 *N.J.* at 209).]

In enacting *N.J.S.A.* 2C:11–4b(2), the legislature rejected recommendations to include subjective elements in the "adequate provocation" standard. The New Jersey Law Revision Commission had suggested that the reasonableness of an actor's reaction to provocation be determined "from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." *Final Report of the New Jersey Law Revision Commission,* Vol. I at 51 (1971). By omitting that somewhat ambiguous criterion while including the term "reasonable provocation" in 2C:11–4b(2), the legislature indicated its intention to reject a subjective test for passion/provocation manslaughter. *State v. Grunow,* 102 *N.J.* 133, 140–42 (1986). In determining whether a defendant is entitled to a jury charge on passion/provocation manslaughter, we therefore must use the objective standard imposed by the legislature.

■ Passion/provocation manslaughter has four elements: the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying. *LaFave & Scott, supra,* § 7.10 at 255. The first two criteria are objective, the other two subjective. If a slaying does not include all of those elements, the offense of passion/provocation manslaughter cannot be demonstrated.

■ The first of the foregoing requirements is that the provocation be adequate. That test is purely objective, because the provocation must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." *State v. King*, 37 *N.J.* 285, 301–02 (1962) (quoting *State v. Herrmann*, 77 *N.J.L.* 534, 535 (E. & A.1909)). The provocation must be severe enough that the "intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the actor." *Model Penal Code* § 210.3, comment. Moreover, in a murder prosecution, as here, the State bears the burden of proving the inadequacy of any provocation. *State v. Grunow, supra,* 102 *N.J.* at 145 (quoting *State v. Powell,* 84 *N.J.* 305, 315 (1980)).

■ The question of whether the provocation is adequate essentially amounts to whether loss of self-control is a reasonable reaction. When deciding whether to instruct a jury on passion/provocation manslaughter, a trial court should view the situation in the light most favorable to the defendant. If no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person, the trial court should withhold the charge.

We emphasize that the actual reaction of the defendant is not a consideration at this point in the analysis. It is irrelevant at this stage whether the defendant in question did in fact "lose his cool." Neither the trial court in deciding whether to instruct the jury on the offense nor the jury in determining whether the offense of passion/provocation manslaughter applies should consider at this point how the defendant in fact reacted to the asserted provocation. Rather, both must limit the focus to the nature and adequacy of the provocation itself.

■ The second element asks whether the perpetrator had reasonable time to cool off before killing the victim. Even if reasonable provocation impassioned the perpetrator, a charge of passion/provocation manslaughter is not available if one

should have cooled off before the killing. As with the first element, the appraisal must be made on an objective basis. Although a trial court may withhold instructions if there was undeniably a reasonable cooling-off period, it is well-nigh impossible to set specific guidelines in temporal terms. Trial courts are therefore remitted to the sense of the situation as disclosed by the facts.

The third requirement of passion/provocation manslaughter is that the provocation must actually have impassioned the perpetrator. It is at this juncture that consideration of the defendant's response becomes appropriate, and the question of whether the defendant's passions were in fact inflamed is one that should almost always be left to the jury. If the provocation might have been reasonable, a trial court should rarely withhold instructions on the basis that the defendant was not actually provoked. An appellate court will be hard-pressed to find that although the passions of a reasonable person might have been so aroused as to cause loss of control, it would be irrational for a jury to conclude that the defendant was in fact so provoked.

The final element looks to whether the perpetrator actually did cool off. As with the other subjective element, it should usually be left to the jury to determine whether the defendant was still impassioned when he or she killed the victim. If a reasonable person might not have cooled off, it will be difficult to argue that the jury acted irrationally in finding that the defendant nevertheless did not in fact cool off.

–B–

 The foregoing considerations guide our analysis of the facts in this case. We must first determine whether a jury could have rationally construed the facts to have provided sufficient provocation. In addressing that question we are reminded that words alone do not constitute adequate provocation. *State v. Crisantos, supra,* 102 *N.J.* at 274. Nor do a

bump and an insult by the victim. *State v. King, supra,* 37 *N.J.* at 301–02. Nor does conduct that is alleged to have been sexually frustrating. *State v. Hollander,* 201 *N.J.Super.* 453, 474 (App.Div.), certif. denied, 101 *N.J.* 335 (1985). On the other hand, the Court has held that a threat with a gun or knife might constitute adequate provocation. *State v. Powell, supra,* 84 *N.J.* at 320; *State v. Bonano,* 59 *N.J.* 515, 523–24 (1971). Although there may be a trend away from "the usual practice of placing the various types of provocatory conduct into pigeonholes," *LaFave & Scott, supra,* § 7.10, at 256, battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative. *Ibid.; see also State v. Herrmann, supra,* 77 *N.J.L.* at 535 ("it would clearly be a jury question whether a blow in the face, either by fist or by open hand, would not be sufficient to exclude murder").

■ In this case it is not so much the facts that are in dispute as the legitimate inferences to be drawn from those facts. Defendant argues in his brief that the following "ample evidence" shows that his violent conduct resulted from reasonable provocation:

> The defendant was engaged in two violent physical confrontations with the bouncer in the space of approximately twenty minutes. During the first confrontation the bouncer pushed the defendant who fell and hit his head on the floor. He was then physically pushed out the door.
>
> The second incident was even more violent. The defendant returned to the bar and tried to pull the door open but Rodriguez held it shut. Rodriguez then forcefully opened the door, slamming and pinning the defendant to the wall. Rodriguez appeared to be "madder" at the defendant than he was the first time. Rodriguez then forcefully "pinned" the defendant, and kicked him.
>
> Approximately fifteen minutes later, the defendant was seen confronting the victim at the nearby street corner. Presumably the defendant was obviously angry and upset as the victim was gesturing for the defendant to get away from him.

We agree that on the basis of the foregoing rendition of the facts and legitimate inferences, a court cannot say that the provocation produced by two physical confrontations was as a matter of law insufficient to cause the passions of a reasonable person to become so aroused as to result in loss of self-control.

That a jury might easily reject defendant's view of the facts and draw inferences different from those reached in defendant's brief, as recited above, is of no moment, for "[t]he test is whether there was room for dispute." *State v. Crisantos, supra,* 102 *N.J.* at 285 (O'Hern, J., dissenting). We are satisfied that the evidence was susceptible of different interpretations and that defendant's view of the case would have permitted a jury rationally to conclude that a reasonable person might, under the circumstances, have reasonably been provoked to the point of loss of control. We observe in passing that because the State does not argue that defendant "started" the altercation, we need not consider whether defendant instigated the bouncer's allegedly-provocative conduct. The issue here is whether a reasonable person would have been provoked, not whether a reasonable person would have engaged in conduct that incited the alleged provocation.

Nor can we say that as a matter of law the time period between defendant's altercation with the bouncer and humiliation at being ejected and his shooting of the victim—something over half an hour—was such that no jury could rationally determine that a reasonable person's inflamed passions might not have cooled sufficiently to permit the return of self-control. The trial court should have left that question as well to the jury to appraise in light of all the surrounding circumstances. And if the two objective criteria were satisfied, then we see nothing in the case to foreclose jury consideration of the subjective elements, namely, whether the provocation in fact aroused the passions of this defendant, and whether his shooting of the victim occurred before he had regained his composure.

In many respects the case is similar to *People v. Harris,* 8 *Ill.*2d 431, 134 *N.E.*2d 315 (1956), in which the victim was a bouncer at a local tavern. When defendant attempted to enter the tavern, the victim immediately accosted him and ordered him to leave the premises. *Id.* at 433, 134 *N.E.*2d at 317. When defendant refused to leave, the victim threw him out, after first beating him with a night stick and causing severe

injuries to defendant's jaw. *Id.* at 435, 134 *N.E.*2d at 318. After a lapse of time, the duration of which was anywhere from fifteen minutes to forty-five minutes (the issue was in dispute), defendant reappeared at the tavern entrance and shot the victim in the back, causing his death shortly thereafter. The Illinois Supreme Court stated: "In view of the evidence of the severe beating and other provocatory circumstances which so closely preceded the shooting, it is our opinion that the trial court was justified in submitting to the jurors' consideration, the question of [passion/provocation manslaughter]." *Id.* at 435, 134 *N.E.*2d at 318; *see also People v. March,* 95 *Ill.App.*3d 46, 50 *Ill.Dec.* 763, 419 *N.E.*2d 1212 (1981) (trial court erred in failing to instruct jury on passion/provocation manslaughter where defendant and victim had engaged in a gun battle outside bar where victim had been working as bouncer, inasmuch as conflicting proof over who had drawn first and fired, coupled with testimony that defendant and victim had engaged in a fist fight before the exchange of gunshots, was evidence that, if believed by jury, would reduce crime to manslaughter based on passion/provocation).

Although distinguishable from the case before us in the severity of the beating that the bouncer administered to the defendant—a difference in degree rather than kind—and, significantly, in Illinois' requirement of a "serious and highly provoking injury" for adequate provocation, 8 *Ill.*2d at 433, 134 *N.E.*2d at 317, *Harris* remains persuasive authority for the proposition that the trial court should have granted defendant's request for a passion/provocation manslaughter charge. There was sufficient testimony to permit a jury to conclude that Rodriguez used physical force to eject defendant from the Lounge. According to Angela Shannon, when the bouncer threw defendant out the first time, she heard someone's head "crack" against something. One could reasonably conclude that it was defendant's head inasmuch as Rodriguez had positioned himself "face-to-face" with defendant when he pushed him down the steps. Additionally, according to Shannon, Rodri-

guez was angry when defendant entered the second time, after which Rodriguez kicked Mauricio. The bouncer admitted that he had used "force" to evict defendant. That use of force was evidenced by the manner in which Rodriguez "sharply" opened the glass door to the Lounge, thereby pinning defendant to the wall, and by the way he was able to restrain defendant from fighting back ("I had both of his arms in my—I had him. He couldn't swing at me.").

Moreover, although the record is by no means specific on the point, it is not unlikely that Rodriguez, as a bouncer, was larger than defendant whose height Rodriguez estimated as between five feet four inches and five feet seven inches and whose weight at between 130 and 150 pounds, and that the "force" used in evicting defendant might fairly be viewed as excessive, thereby provoking defendant to lash back. *See State v. Powell, supra,* 84 *N.J.* at 315 (in determining whether to charge manslaughter, courts should rely on all inferences that "logic and common sense" will allow).

We hardly need add that the inferences that defendant argues should be drawn from the evidence do not represent the only view of the case that the facts could yield. Those inferences are simply permissible, not by any means compelled. There was ample proof that defendant's homicidal act was coolly calculated; that smarting from the indignity visited upon him by the bouncer, he returned to his room, changed into garments that would conceal a weapon, and made his way back to the Lounge where he was again rebuffed; and that thereafter he lay in wait for his target to depart from the premises, whereupon he recovered the firearm from where he had secreted it under a parked vehicle and stalked his prey into the parking garage, where he gleefully and maliciously finished him off. But neither is that the only version that the jury could have extracted from the evidence.

The point to be made is that when, as in this case, a defendant requests a charge on passion/provocation man-

slaughter as a lesser-included offense of murder, the trial court should instruct the jury on that form of manslaughter if an examination of the record discloses that the evidence satisfies the rational-basis standard—that is, that " 'it would not be *idle* to have the jury decide' whether the defendant had committed the lesser-included offense." *State v. Crisantos, supra,* 102 *N.J.* at 278 (quoting *State v. Sinclair,* 49 *N.J.* 525, 540 (1967)). Because the evidence in this case met that standard, the trial court's failure to have delivered the requested charge amounted to reversible error.

### III

Although our ruling that the failure to grant defendant's request to charge was prejudicially erroneous is sufficient to dispose of the appeal, we touch on defendant's remaining allegations of error for the trial court's guidance in the event the same issues arise on the retrial.

The Appellate Division ruled that the trial court correctly denied defendant's request to charge the jury on aggravated manslaughter based on intoxication. We agree with the court below that the evidence was entirely insufficient to create a jury question on defendant's intoxication.

Under *N.J.S.A.* 2C:2–8a self-induced intoxication is a defense to a purposeful or knowing crime, *State v. Cameron, supra,* 104 *N.J.* at 52–53. Self-induced intoxication can reduce the offense of purposeful or knowing murder to manslaughter or aggravated manslaughter. *State v. Warren,* 104 *N.J.* 571, 577 (1986). The statutory definition of intoxication is "a disturbance of mental or physical capacities resulting from the introduction of substances into the body." See *N.J.S.A.* 2C:2–8e.

After considering at length in *Cameron* the guidelines for determining when a trial court should instruct a jury on intoxication, we concluded that a jury issue arises only if there exists a rational basis for the conclusion that defendant's "faculties" were so "prostrated" that he or she was incapable of

forming an intent to commit the crime. The Court discussed six factors that are relevant to the issue: "the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself), any odor of alcohol or other intoxicating substance, results of any test to determine blood-alcohol content, and the actor's ability to recall significant events." 104 *N.J.* at 56.

Applying those criteria to the facts before us, we conclude that the trial court correctly refused to instruct on intoxication. There was no evidence of defendant's blood-alcohol level or the amount of alcohol he had consumed or over what period of time he had been drinking. This case is therefore unlike *State v. Bey,* 112 *N.J.* 123, 143 (1988), in which defendant testified that he had consumed 120 ounces of malt liquor, some straight rum, and had smoked a considerable amount of marijuana, and *State v. Frankland,* 51 *N.J.* 221, 223 (1968), in which defendant testified that he had consumed fifteen glasses of Scotch whiskey. . Both cases warranted intoxication instructions. Moreover, there was no proof here that defendant smelled of alcohol or that he was unable to recall significant events. See *State v. Cameron, supra,* 104 *N.J.* at 55. True, the bouncer had refused defendant admission to the Lounge in the belief that he had already had enough to drink, and witnesses testified that defendant was "drunk," "intoxicated," and "high." However, as we observed in *Cameron,* "these are no more than conclusory labels, of little assistance in determining whether any drinking produced a prostration of faculties." 104 *N.J.* at 56.

To counter the foregoing the prosecution produced substantial evidence that defendant had not suffered a "prostration of faculties." During the hour preceding the fatal shooting, defendant was able to count, walk, climb stairs, and stand up "immediately" after being wrestled down a flight of stairs.

Between the first and second altercations, defendant had sufficient control over his faculties to change into a long overcoat capable of concealing the twenty-one-inch sawed-off shotgun he used to kill Rizzo. He also had the presence of mind to gesture to Vecchione and Siero to leave him alone when they attempted to observe his activities. Defendant waited for Rizzo to come out of the restaurant and had a few words with him on the street corner. He then waited while Rizzo walked down the well-illuminated Bergenline Avenue before cornering him in the desolate surroundings of the parking garage. He also managed to elude detection by the police, who arrived shortly after the shooting.

Defendant's behavior did not establish that his intoxication had prostrated his faculties to the extent that a jury could conclude that he did not possess the willfulness, deliberation, and premeditation necessary to commit purposeful and knowing murder. The trial court correctly rejected the intoxication instruction.

## IV

We have examined defendant's remaining contentions, addressed to the assistant prosecutor's comments in summation and the trial court's ruling on the inadmissibility of portions of defendant's out-of-court statement, and find them to be without merit.

Judgement reversed, cause remanded.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN——7.

*Opposed*—None.