**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4143-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

EDGAR MARTINEZ,
a/k/a EDGAR A. MARTINEZ,

      Defendant-Appellant.

_____

Submitted July 14, 2020 – Decided September 2, 2020

Before Judges Sabatino and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-01-0025.

Joseph E. Krakora, Public Defender, attorney for appellant (Parampreet Singh, Designated Counsel, on the brief).

Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (Nancy Anne Hulett, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant, Edgar Martinez, appeals from a jury verdict convicting him of first-degree murder and two related weapons offenses. The evidence presented at trial established that defendant was part of a group of men who fought with the victim, J.G.-E.,[1] and then chased after him when he fled into a restaurant. There, defendant stabbed the unarmed victim to death. Defendant at trial did not dispute that he killed J.G.-E. Rather, defense counsel argued that defendant did not commit knowing/purposeful murder but rather the lesser offense of passion/provocation manslaughter or, in the alternative, reckless or aggravated manslaughter based on defendant's intoxication. The jury was instructed on the law governing those defense theories and rejected them.

On appeal, defendant presents several contentions, none of which were raised below. Defendant's appellate counsel argues the murder verdict was against the weight of the evidence. Counsel also contends the prosecutor committed misconduct during summation. Defendant filed a pro se brief contending the trial court failed to sua sponte charge the jury on the law

---

[1] Out of respect for the privacy of the homicide victim and his survivors, we use initials to refer to the decedent in this opinion.

pertaining to the defense of others and failed to instruct the jury that the defense of intoxication applies to the weapons offenses and not just the homicide. After reviewing the trial record in light of the applicable legal principles, we reject all these contentions and affirm defendant's convictions.

I.

Defendant was indicted for first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); unlawful possession of a knife, N.J.S.A. 2C:39-5(d); and possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d). After a ten-day trial, the jury returned a guilty verdict on all counts as charged in the indictment. The court sentenced defendant on the murder conviction to the statutory minimum thirty-year term of imprisonment and parole ineligibility. The court merged the two weapons convictions and imposed an eighteen-month prison term to be served concurrently to the sentence imposed on the murder conviction.

The State presented evidence at trial from several witnesses who testified that in the early morning hours on July 4, 2015, defendant stabbed the victim to death in the kitchen of a restaurant in New Brunswick. As noted, defendant does not dispute he fatally stabbed J.G.-E. The factual and legal issues contested at trial focused on defendant's level of intoxication and whether the stabbing was provoked by the victim.

3

To provide context for defendant's weight-of-the evidence contentions, we summarize the events that led up to the fatal encounter. J.G.-E. and Jacqueline Martinez[2] were enjoying a night out together in New Brunswick. At around 2:00 a.m., the pair left a local bar and traveled to a restaurant to get something to eat. During their meal, J.G.-E. called his former girlfriend, Benigna Reyes, and invited her to come to the restaurant.

When Reyes arrived, she first approached a table where several men, including defendant, were drinking. After speaking with them, Reyes came over to the table at which J.G.-E. and Jacqueline were seated. Jacqueline prepared to leave so that J.G.-E. and Reyes could discuss the status of their relationship, but J.G.-E. told her to wait for him so that he could take her home.

Reyes confronted Jacqueline outside the restaurant. Reyes insulted Jacqueline and then struck her on the eyebrow, knocking her to the ground. J.G.-E. and a waitress had followed Reyes outside. J.G.-E. attempted to break up the fight between Reyes and Jacqueline.

The men who Reyes had talked to in the restaurant also went outside and confronted J.G.-E. Defendant was the first in the group to intervene. Reyes

---

[2] Because Jacqueline Martinez and defendant coincidentally share the same surname, we refer to Ms. Martinez as Jacqueline to avoid confusion. We intend no disrespect by this informality.

yelled to the group, "beat the shit out of him," and quickly left the scene in her car. The men began to pummel J.G.-E.

J.G.-E. was able to break away and fled into the restaurant. Defendant pursued him. Defendant forced his way into the restaurant and chased J.G.-E. into the kitchen. J.G.-E. attempted to flee through a back door, but defendant punched him, knocking him to the ground and preventing his escape. When J.G.-E. stood up, he defensively placed his arms across his body to protect himself as defendant stabbed him multiple times with a small folding knife. Defendant then ran out of the restaurant while holding the bloody knife in his left hand.

New Brunswick Police Officers Bellafronte and Berrios received a report of a stabbing at a local restaurant and were dispatched to investigate. Relying on a description of the stabbing suspect provided by the police dispatcher, the officers spotted defendant on Suydam Street. The officers blocked defendant's path with their police vehicle and approached him on foot. They observed that defendant had blood on his shirt. The officers located a small folding knife roughly five to ten feet from where defendant was standing. The knife appeared to have blood on it. Defendant was arrested and transported to police headquarters.

A-4143-17T4

There, Sergeant Thierry Lemmerling and Detective Gregory Morris conducted a stationhouse interrogation that began at 6:56 a.m., roughly three hours after the stabbing, and lasted for approximately an hour.[3] Sergeant Lemmerling described defendant as "pretty calm" and "cooperative," although he was "obviously upset." Sergeant Adrian Villegas, who asked defendant prior to the interrogation whether he wished to speak Spanish or English, testified that "there was some indication that [defendant] may have been intoxicated. But . . . his intoxication did not appear to be in [any] way, shape or form an impairment of his [faculties]."

An electronic recording of the stationhouse interrogation was played for the jury. Defendant explained to the interrogating officers that he had met two friends around 7:00 or 8:00 p.m. at a local restaurant. Around 2:00 a.m., defendant and his friends left that restaurant and went to the restaurant where

---

[3] The trial court denied defendant's motion to suppress his video-recorded statement, ruling that defendant knowingly and voluntarily waived his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). The admissibility of defendant's statement to police is not challenged on appeal. We note that in concluding defendant made a knowing and voluntary waiver of his Miranda rights, the court found "[d]efendant . . . appeare[d] somewhat tired. But, he appeared . . . on the video to be sober, coherent. He was responsive to . . . questions. He seemed to have his wits about him."

A-4143-17T4

the violent incident occurred. Defendant stated he was already "drunk." They continued drinking beer there.

About two hours after arriving at the restaurant, defendant saw a man and woman walk out of the restaurant "and then the . . . waitress, . . . came in, saying that the guy was beating up [the] girl." He had never met the woman who exited the restaurant with J.G.-E. Defendant and his friends walked outside. Defendant admitted that he initiated a fight with J.G.-E. He acknowledged he did not see J.G.-E. hitting the woman before he started the fight. He also did not see J.G.-E. holding any weapons. Defendant stated his friends told him not to fight J.G.-E., but when he "saw the girl beaten . . . [he] lost it." The group carried the fight across the street before J.G.-E. ran back into the restaurant.

During the course of the interrogation, defendant provided different accounts of the conclusion of the violent encounter with J.G.-E. At certain points, defendant told Detective Morris that he did not remember going back inside of the restaurant. Although he admitted that he was in possession of a knife while he was out drinking, he claimed he did not remember stabbing the victim. At other points in the interrogation, however, defendant told the detectives he did remember chasing the victim into the restaurant and pulling out his knife.

7

Furthermore, Detective Morris questioned defendant whether "the first time you stabbed him was . . . inside the restaurant?" Defendant responded, "yeah, it was." Defendant stated he did not know how many times he stabbed J.G.-E. or where he stabbed him. He stated he "was so drunk" that he could not remember.

Defendant told the officers that after leaving the restaurant, he tried to run to his home. He remembered being stopped by the police. He acknowledged he knew why the police were looking for him but did not know how badly he had injured J.G.-E. He admitted that everything was his "fault."

The State presented exterior surveillance video recordings that showed the altercation involving Jacqueline, Reyes, and J.G.-E., and the fight defendant initiated with J.G.-E. when defendant exited the restaurant. Surveillance video also showed the victim fleeing into the restaurant and defendant forcing his way into the restaurant in pursuit of the victim.

The medical examiner's autopsy determined J.G.-E. was five feet, two inches in height and weighed between 112 and 122 pounds. The autopsy revealed five stab wounds, one of which was lethal. There were two penetrating stab wounds on the left side of the victim's chest. J.G.-E. had two stab wounds to his left arm, one in the upper arm and one to his wrist. The fifth stab wound

8

was in the left clavicle area. The medical examiner reported this wound cut the subclavian artery, causing a fatal loss of blood.

Defendant presented one witness at trial, Marco Gonzalez, who was one of the men who accompanied defendant on the night of the stabbing. Gonzalez testified that he began drinking beer with defendant and one other person at a bar around 7:00 or 8:00 p.m. Around 10:00 p.m., the group left that bar and traveled to a different bar. There, they continued drinking beer until 2:00 a.m., at which time they went to the restaurant where the incident occurred and continued drinking.

Gonzalez testified that at some point, "one of the waitresses yelled that [they] should go out and help a lady outside." The group went outside and defendant began fighting with J.G.-E. Gonzalez testified defendant "was a little drunk" at that point. Gonzalez kept Reyes and Martinez separated from one another while defendant, the victim, and the other member of the group fought. Eventually, Gonzalez saw the victim run back into the restaurant.

Gonzalez testified that J.G.-E. screamed at his pursuers that "he was going to hit [them] later." That prompted defendant to pull out a knife. Gonzalez testified he attempted to stop defendant at the restaurant door but was

unsuccessful.  Defendant chased the victim into the kitchen.  Gonzalez testified

that shortly thereafter, he and defendant fled from the restaurant.

## II.

Defendant's appellate counsel presents the following contentions for our

consideration:

POINT I

APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE APPELLANT WAS DEPRIVED OF A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.

POINT II

APPELLANT'S CONVICTION MUST BE REVERSED BECAUSE IT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

A. THE RECORD ESTABLISHES APPELLANT WAS ADEQUATELY PROVOKED BY [J.G.-E.].

B. THE RECORD ESTABLISHES APPELLANT WAS INTOXICATED AND UNABLE TO FORM THE REQUISITE INTENT TO COMMIT FIRST-DEGREE MURDER.

Defendant also submitted a pro se brief raising the following additional

contentions:

SUPPLEMENTAL POINT I

APPELLANT'S CONVICTION MUST BE VACATED BECAUSE THE TRIAL COURT SHOULD HAVE SUA SPONTE CHARGED THE JURY WITH THE LESSER-INCLUDED OFFENSE OF DEFENSE OF OTHERS, AS AN AFFIRMATIVE DEFENSE, BECAUSE THERE WAS A RATIONAL BASIS, AND MORE THAN AMPLE EVIDENCE TO SUPPORT SUCH A DEFENSE AT THE CONCLUSION OF TRIAL.

SUPPLEMENTAL POINT II

THE LOWER COURT'S INSTRUCTION ON VOLUNTARY INTOXICATION CONTAINED REVERSIBLE ERROR BECAUSE IT FAILED TO INFORM THE JURY THAT THE DEFENSE APPLIED TO THE CHARGE OF POSSESSION OF THE MURDER WEAPON FOR AN UNLAWFUL PURPOSE, AS MANDATED IN STATE V. WARREN, 104 N.J. 571 (1986).

III.

We first address defendant's contention, raised for the first time on appeal, that the prosecutor committed misconduct during his summation. Defendant argues the prosecutor made two distinct improper comments during his closing arguments to the jury: (1) the prosecutor inappropriately urged the jury to assess the effect of defendant's intoxication on his culpable mental state by considering the volitional decisions defendant made leading up to the fatal attack; and (2)

11

the prosecutor inappropriately referred to J.G.-E. as a "kid." We address each of these contentions in turn.

We first acknowledge the legal principles that apply to our review of a prosecutor's arguments to the jury. "Consistent with their obligation to seek justice, prosecutors may not advance improper arguments." State v. Lazo, 209 N.J. 9, 29 (2012). That said, we expect prosecutors "to make vigorous and forceful closing arguments to juries," and we therefore afford them "considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999).

An impropriety in a prosecutor's summation is not a ground for reversal "unless the conduct was so egregious as to deprive the defendant of a fair trial." State v. Papasavvas (I), 163 N.J. 565, 625 (2000) (quoting State v. Timmendequas (I), 161 N.J. 515, 575–76 (1999)). A reviewing court will find grounds for overturning a guilty verdict only if the prosecutor's conduct was "clearly and unmistakably improper" and had the effect of "substantially prejudic[ing] defendant's fundamental right to have a jury evaluate the merits of his defense." Ibid.

A-4143-17T4

The propriety of a prosecutor's remarks, moreover, must be judged in the context of the entire trial record and defense counsel's summation.  See State v. Morton, 155 N.J. 383, 457 (1998) (assessing a prosecutor's remarks in summation in light of the trial record and permitting a prosecutor to refer to the defendant as a "cold-blooded killer" in response to defense counsel's closing remarks).  So long as the prosecutor's response is "based on reasonable inferences drawn from the evidence presented during trial," we will not find the prosecutor to have deprived defendant of the right to a fair trial.  Id. at 458.

Furthermore, our assessment of a claim of prosecutorial misconduct "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred."  State v. Marshall, 123 N.J. 1, 153 (1991).  Specifically, even when an appellate court determines that a prosecutor's remarks were improper, we must consider whether defense counsel made a timely and proper objection.  Frost, 158 N.J. at 83 (citing State v. Marshall, 123 N.J. 1, 153 (1991)).  "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial."  Ibid. (citing State v. Ramseur, 106 N.J. 123, 323 (1987)).  The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made.  Ibid.; see also State v. Nelson, 173 N.J. 417, 471 (2002) (noting the

absence of a contemporaneous objection suggests that "in the context of the trial the error was actually of no moment" (quoting State v. Macon, 57 N.J. 325, 333 (1971))). "The failure to object also deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 84 (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997)).

Having identified the operative principles guiding our review of the prosecutor's closing arguments, we turn to their application in view of defendant's specific contentions.

A.

Defendant first challenges the prosecutor's comment that, "[defendant] made that choice and if he's making choices, ladies and gentleman, then you have to believe that he is cognizant, that his drinking is not impairing him to the point where he doesn't know what he's doing."

As noted in our recitation of the governing legal principles, we do not review a prosecutor's remarks in isolation. Rather, the portion of the prosecutor's summation defendant now challenges must be viewed in context with the prosecutor's entire summation. Mindful of the disputed issues at trial, the prosecutor focused on whether defendant had reasonably been provoked to use lethal force and whether, considering his level of intoxication, defendant

14

harbored the required mental culpability state for the crime of murder at the moment he fatally stabbed the victim.

In essence, the prosecutor asked the jury to infer that defendant acted knowingly or purposely[4] from the decisions he made in response to events as they unfolded just before and during his confrontation with J.G.-E. The prosecutor noted, for example, that defendant made a choice to try to be a "Good Samaritan"[5] and intercede in the physical altercation involving Reyes, Jacqueline, and the victim. That choice, the prosecutor argued, demonstrated an

---

[4] Although first-degree murder often is referred to as "knowing/purposeful" murder, the State need only prove a "knowing" culpable mental state. See N.J.S.A. 2C:11-3(a)(2) ("criminal homicide constitutes murder when . . . the actor knowingly causes death or serious bodily injury resulting in death."); see also N.J.S.A. 2C:2-2(c)(2) ("When the law provides that a particular kind of culpability suffices to establish an element of an offense such element is also established if a person acts with a higher kind of culpability."). N.J.S.A. 2C:2-2(b)(2), which defines the "knowing" kind of culpability, provides:

> [a] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.

[5] Defense counsel in his summation had described defendant as a "Good Samaritan" who, "through a series of unfortunate events," made the fateful error of killing J.G.-E.

awareness of the circumstances.  The prosecutor also argued that by responding to the threat of future retaliation the victim purportedly made while fleeing, defendant demonstrated he was cognizant of the fast-moving situation so that when he pulled out the concealed knife in response to the threat, defendant formed an intent to stab J.G.-E.

Viewed in light of the trial record, Morton, 155 N.J. at 457, we conclude the prosecutor's argument to the jury, connecting defendant's cognizance and decision-making with his ability to harbor the culpable mental state for knowing/purposeful murder, was reasonable and entirely consistent with the instructions the trial judge provided to the jury,  see Model Jury Charges (Criminal), "State of Mind" (approved Jan. 11, 1993) (instructing that "state of mind . . . must ordinarily be inferred from the facts," and that it is within the jury's power to find proof of state of mind "from the nature of [a defendant's] acts and . . . conduct, and from all [a defendant] said and did at the particular time and place, and from all of the surrounding circumstances").

The prosecutor's remarks also were an appropriate response to defense counsel's opening statement and summation.  Counsel criticized the police investigation, noting that police failed to test defendant's blood alcohol content even though defendant at the interrogation claimed to be too intoxicated to

16

remember certain details of the stabbing episode. In the absence of scientific evidence of defendant's blood alcohol content, counsel told the jury in his opening remarks to infer the impact of defendant's level of intoxication on his state of mind by "pay[ing] very close attention to the date of this offense, the time of the offense, the location, the presence of alcohol. Pay attention to what happened outside the restaurant because there is a video." During his summation, counsel returned to the topic of defendant's state of intoxication by arguing defendant was clearly "drunk" and "falling asleep" during the interrogation. The prosecutor's argument now claimed to be misconduct is consistent with the process of inferential reasoning defense counsel urged the jury to employ, albeit the prosecutor, of course, suggested a different conclusion from the trial evidence than the one defense counsel proposed.

In sum, viewed in the context of the disputed issues in this case, the prosecutor's comments concerning defendant's volitional decisions were reasonably related to the evidence presented at trial, Frost, 158 N.J. at 82, and were a fair response to the defense summation. So long as prosecutors stay "within the evidence and the legitimate inferences therefrom," State v. R.B., 183 N.J. 308, 330 (2005) (quoting State v. Mayberry, 52 N.J. 413, 437 (1968)), we leave it "for the jury to decide whether to draw the inferences the prosecutor

urged," State v. Carter, 91 N.J. 86, 125 (1982). We add the jury was properly instructed that they "are the sole and exclusive judges of the evidence, of the credibility of the witnesses and the weight to be attached to the testimony of each witness." The court also properly charged the jury that the arguments of counsel are not evidence.

We therefore conclude the portion of the prosecutor's summation defendant now challenges was not error, much less plain error. See R. 2:10-2 (disregarding "[a]ny error or omissions" not raised below "unless it is of such a nature as to have been clearly capable of producing an unjust result").

B.

We next consider defendant's contention the prosecutor inappropriately characterized J.G.-E. as "a kid" who "was only twenty years old at the time." Defendant maintains it was prejudicial and an inappropriate appeal to sympathy for the prosecutor to describe the victim in this manner given that the victim was an adult. We disagree. Although the prosecutor referred to the victim as a "kid," he did not misrepresent the victim's age or otherwise suggest the victim was a child under the age of majority. To the contrary, the prosecutor in the same breath reminded the jury that J.G.-E. was twenty years old. We view the prosecutor's fleeting description of J.G.-E. as a "kid" to be a nonprejudicial

A-4143-17T4

colloquial way to describe a young adult victim who was attacked and chased by a group of older, larger males.

The prosecutor also noted the victim's small stature, arguing to the jury J.G.-E. was "five-foot-two, 116 pounds" and not "much of an opponent." The prosecutor's comments on the victim's age and stature were reasonably related to his ability to provoke defendant to use lethal force—a critical issue in dispute. Frost, 158 N.J. at 82.

We therefore conclude in the circumstances of this case the prosecutor's characterization of the victim was not prosecutorial misconduct. Even were we to accept defendant's argument the term "kid" was inappropriate as a nuanced appeal to sympathy, the prosecutor's comment would not warrant reversal of the murder conviction. The absence of a timely objection to the prosecutor's characterization of the victim is telling and supports our determination that the fleeting remark was "of no moment." Nelson, 173 N.J. at 471 (quoting Macon, 57 N.J. at 333).

## IV.

We turn next to defendant's contention the murder verdict was not supported by the evidence presented at trial. We note preliminarily that defendant failed to move for a new trial before the trial court pursuant to Rule

3:20-1. We therefore may refuse to consider his contention the jury verdict is against the weight of the evidence. State v. Smith, 262 N.J. Super. 487, 511 (App. Div. 1993) (interpreting Rule 2:10-1). We nonetheless choose to consider defendant's contention in the interests of justice. Ibid. In doing so, we apply the plain error standard of review. R. 2:10-2.

We begin our analysis by noting we will reverse a jury verdict on these grounds only if "it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. There is no miscarriage of justice, moreover, unless we determine that no "trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." State v. Afanador, 134 N.J. 162, 178 (1993) (quoting State v. Carter, 91 N.J. 86, 96 (1982)). This has been described as an "extraordinarily lenient standard of review." State v. Jackson, 211 N.J. 394, 414 (2012).

We may not overturn the verdict, for example, "because [we] might have found otherwise upon the same evidence." State v. Johnson, 203 N.J. Super. 127, 134 (App. Div. 1985). Nor will we disturb the jury's credibility determinations that are based on live-witness testimony. State v. Saunders, 302 N.J. Super. 509, 524 (App. Div. 1997) ("The jury is free to believe or disbelieve a witness's testimony."). In sum, appellate intervention is warranted only where

it is apparent that "an injustice result[ed] from a plain and obvious failure of the jury to perform its function."  Ibid.

Defendant makes two analytically distinct claims regarding the weight of the trial evidence.  First, defendant asserts that the evidence can only support the conclusion that defendant killed the victim in the heat of passion and upon adequate provocation.  Second, defendant maintains a reasonable jury could only find that he was so intoxicated during the killing that he lacked the requisite mental capacity to commit a knowing or purposeful murder.

We reject both arguments.  The trial court properly instructed the jury with regard to passion/provocation manslaughter, reckless manslaughter, aggravated manslaughter, and voluntary intoxication.  Importantly, defendant does not challenge those instructions on appeal, at least with respect to the homicide.[6] The jury thus was properly entrusted to decide which type of homicide defendant committed.  We conclude the jury reached a verdict that was amply supported by the trial evidence.

---

[6]  As we will address in section VI, defendant unpersuasively contends in his pro se brief the trial court failed to explain to the jury that the intoxication defense applies to the weapons possession charges.

## A.
### Passion/Provocation Manslaughter

After a jury determines the State has proved the material elements of murder under N.J.S.A. 2C:11-3, it may consider whether the homicide should be reduced to the lesser-included offense of passion/provocation manslaughter under N.J.S.A. 2C:11-4(b)(2).  Passion/provocation manslaughter is defined as a "homicide which would otherwise be murder . . . [but] is committed in the heat of passion resulting from a reasonable provocation."  Ibid.  This downgrade option allows a jury to account for "the presence of reasonable provocation, coupled with [a] defendant's impassioned actions, [which] establish[es] a lesser culpability."  State v. Robinson, 136 N.J. 476, 482 (1994).  There are four critical elements of passion/provocation manslaughter: "(1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled off before the slaying."  State v. Carrero, 229 N.J. 118, 129 (2017) (quoting State v. Mauricio, 117 N.J. 402, 411 (1990)).

We focus our attention on the first element.  The adequacy of the provocation depends upon "whether loss of self-control is a reasonable reaction."  State v. Foglia, 415 N.J. Super. 106, 126 (App. Div. 2010) (quoting

Mauricio, 117 N.J. at 412). Loss of self-control is reasonable if the provocation is "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." Ibid. (alterations in original) (quoting Maurico, 117 N.J. at 409). Furthermore, "the defendant's response must be proportionate to the provocation." State v. Docaj, 407 N.J. Super. 352, 369 (App. Div. 2009) (citations omitted).

Defendant contends he was reasonably provoked to kill when he perceived that J.G.-E. had assaulted Jacqueline. Defendant acknowledges that Jacqueline was a stranger to him. He nonetheless argues that a male seeking to defend a female from physical assault by another man can be an adequate provocation for purposes of the first element of passion/provocation manslaughter. We need not decide whether, as a matter of law, such conduct to protect a stranger is sufficient to satisfy the first element. Cf. State v. Coyle, 119 N.J. 194, 225–26 (1990) (noting a person may be provoked by conduct that causes injury to a relative or close friend) (citations omitted). The jury in this case was duly instructed as to passion/provocation manslaughter, and the State does not contend that the trial court erred in giving the jury the option to reduce the crime of murder to the lesser offense of manslaughter.

The fact the passion/provocation mitigation defense was put before the jury, however, does not mean the jury was required in these circumstances to find that there was adequate provocation to chase down and kill an unarmed victim. The jury in its role as trier-of-fact was, of course, free to reject defendant's argument he was reasonably provoked to kill J.G.-E. because he believed the victim had assaulted a female.

Defendant also asserts that J.G.-E.'s threat to "hit" him at some future time, made while fleeing, provided adequate provocation for defendant to pursue and kill the victim. Compare Crisantos, 102 N.J. 265, 274 (1986) (noting that words alone generally do not provide adequate provocation) with Mauricio, 117 N.J. at 414 ("[A] threat with a gun or knife might constitute adequate provocation."). Once again, the question before us is not whether the jury should have been presented the option to reduce the homicide to passion/provocation manslaughter. Rather, the issue is whether the jury was required to reduce the level of homicide based on the trial evidence. Clearly, it was not.

For one thing, the evidence that the victim threatened to retaliate came only from defendant's witness, Gonzalez. None of the State's witnesses testified the victim threatened future retaliation. The jury was free, of course, to conclude the threat was never made. See Saunders, 302 N.J. Super. at 524 ("The jury is

free to believe or disbelieve a witness's testimony."). But even assuming the jury found the fleeing victim did threaten to "hit" his pursuers "later," it was free to conclude that threat was insufficient to reasonably provoke defendant to pull out a knife, chase down the fleeing victim, prevent him from escaping through the back door, corner the unarmed victim in the kitchen, and stab him repeatedly.

The point simply is that considering the evidence presented at trial, a reasonable jury could have found that defendant's loss of control was unreasonable and that J.G.-E. did not adequately or actually provoke defendant to kill.

### B.
### Intoxication Defense

We turn next to defendant's contention the trial evidence irrefutably established that he was so intoxicated that he was not able to form the culpable mental state for murder. Voluntary intoxication can be a defense if it negates an element of an offense. N.J.S.A. 2C:2-8(a). In the case of purposeful or knowing murder, voluntary intoxication can reduce the offense from murder to manslaughter or aggravated manslaughter.[7] Mauricio, 117 N.J. at 418. To

---

[7] Manslaughter and aggravated manslaughter require proof of the reckless culpable mental state defined in N.J.S.A. 2C:2-2(b)(3). The defense of involuntary intoxication does not apply to an offense that carries a reckless

A-4143-17T4

establish intoxication as a defense, evidence must show that "defendant's faculties were so prostrated that he could not have formed an intent to purposely or knowingly kill." Mauricio, 117 N.J. at 410.

Defendant acknowledges the jury was properly instructed with respect to self-induced intoxication. We conclude a reasonable jury could conclude from the evidence presented at trial that defendant's level of intoxication did not prevent him from purposefully or knowingly killing the victim. Defendant's conduct demonstrated his awareness of the situation and a conscious decision to engage in a fight with J.G.-E., believing he had assaulted a female. The defense argument he was acting as a Good Samaritan is in tension with the notion that he was too intoxicated to be aware of the nature of his conduct or the attendant circumstances. See N.J.S.A. 2C:2-2(b) (defining the "knowing" culpable mental state in terms of awareness of one's conduct and the attendant circumstances). The jury also had the benefit of viewing surveillance videos from which it could

---

culpable mental state. See N.J.S.A. 2C:2-8(b) ("When recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial."); see also State v. Baum, 224 N.J. 147, 162 (2016) (noting "a defendant claiming to have been voluntarily intoxicated at the time of the commission of a crime for which the requisite mental state is recklessness, such as aggravated manslaughter[,] may nonetheless be found guilty" (citing Warren, 104 N.J. at 575–76)).

have drawn the inference that defendant's physical and mental faculties were not so prostrated by his level of intoxication that he could not act purposefully or knowingly. The jury also viewed the electronic recording of the stationhouse interrogation during which defendant was able to answer questions, recall significant details of what transpired, and acknowledge that the incident was his fault. Defendant's own trial witness, Gonzalez, described him as being only "a little drunk." All these facts and circumstances provide an evidential basis from which the jury could reasonably reject defendant's argument that he was too inebriate to harbor the state of mind needed to commit murder.

In sum, the jury, fully instructed on these mitigation defenses, acted within the ambit of its discretion in rejecting defendant's arguments on both passion/provocation and intoxication. We do not hesitate to conclude from our review of the record that the State presented sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that defendant was guilty of murder as charged. Afanador, 134 N.J. at 178. Accordingly, defendant has failed to show it is clearly apparent that a manifest denial of justice resulted from the jury's verdict. R. 2:10-1.

V.

Defendant in his pro se brief claims the court erred by not sua sponte

charging the jury concerning defense of others, N.J.S.A. 2C:3-5.[8]  Specifically,

defendant argues the evidence presented at trial established a rational basis for

a jury to acquit defendant based upon a finding that the killing was justified by

the defense of either Reyes or Jacqueline.  See State v. Bryant, 288 N.J. Super.

27, 35 (App. Div. 1996) ("The trial court must charge the jury on . . . defense of

another if there exists evidence in either the State's or the defendant's case

---

[8] N.J.S.A. 2C:3-5(a) provides the use of force in the defense of others is justified when:

> (1) The actor would be justified under [N.J.S.A.] 2C:3-4 in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect; and
>
> (2) Under the circumstances as the actor reasonably believes them to be, the person whom he seeks to protect would be justified in using such protective force; and
>
> (3) The actor reasonably believes that his intervention is necessary for the protection of such other person.

Furthermore, N.J.S.A. 2C:3-4(b)(2) provides the use of deadly force is authorized only if the "the actor reasonably believes that such force is [immediately] necessary to protect himself [or another under N.J.S.A. 2C:3-5(a)(1)] against death or serious bodily harm."

sufficient to provide a 'rational basis' for its applicability." (quoting State v. Martinez, 229 N.J. Super. 593, 600 (App. Div. 1989))).

This contention lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(2). The trial court, defense counsel, and prosecutor expended considerable effort discussing and fashioning appropriate jury instructions. Defendant never requested a defense of another charge, and for good reason. A trial court's obligation to instruct the jury on the court's own motion, it bears noting, arises "only when the evidence clearly indicates the appropriateness of such a charge[.]" State v. Rivera, 205 N.J. 472, 489 (2011) (quoting State v. Walker, 203 N.J. 73, 87 (2010)). A trial court need not on its own initiative scour the record for some conceivable combination of facts and inferences that would form a rational basis to sustain an unrequested jury instruction. Id. at 490 (citing State v. Thomas, 187 N.J. 119, 134 (2006)).

Our review of the record convinces us there was no rational basis to instruct the jury on defense of another. J.G.-E. had fled the street and retreated into the restaurant kitchen before defendant stabbed him. Neither Reyes nor Jacqueline were in the kitchen when defendant unleashed lethal force. Thus, any conceivable threat of death or serious bodily harm to either Reyes or Jacqueline—illusory in any event—had dissipated and was not imminent by the

time defendant cornered the victim in the kitchen. Accordingly, the use of lethal force against the victim inside the restaurant was not immediately necessary to protect Reyes or Jacqueline, as required by N.J.S.A. 2C:3-4(a) and N.J.S.A. 2C:3-5(a). Cf. State v. Harmon, 104 N.J. 189, 208 (1986) (finding inapplicable the defense of self-defense to a charge of unlawful possession of a firearm "when a person arms himself prior to a danger becoming imminent"). It strains credulity to suggest defendant was somehow reasonably protecting these women at the moment he repeatedly stabbed J.G.-E. in the chest.

VI.

Finally, we address defendant's pro se contention the trial court failed to instruct the jury that the defense of voluntary intoxication applied to the charged offense of possession of a weapon for an unlawful purpose. The record belies defendant's contention. The court did in fact instruct the jury that the defense of voluntary intoxication applies to all charged offenses with a purposeful or knowing mental state, including the weapons offenses.

Specifically, the trial transcript reveals the court first explained to the jury how the intoxication defense applies to the murder charge. The court then explained, "evidence that the defendant ingested intoxicants may be considered by you in determining whether the State has proven beyond a reasonable doubt

that the defendant acted purposely or knowingly with respect to . . . unlawful possession of a weapon and possession of a weapon for an unlawful purpose."

To the extent we have not addressed them, any additional arguments raised by defendant or his counsel lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4143-17T4