**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5010-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH MCCOY,
a/k/a ABDUL M. AKBAR
SALAAM,

     Defendant-Appellant.

_____

Submitted April 19, 2021 – Decided June 28, 2021

Before Judges Rothstadt and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 17-06-1173.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sarah D. Brigham, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions for murder and related firearms offenses. The victim, J.H.,[1] was defendant's girlfriend and was fatally shot in the apartment they shared in Atlantic City. Defendant was sentenced on the murder conviction to a fifty-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant contends the prosecutor committed misconduct by failing to instruct the grand jury that it could consider lesser-included homicide offenses. He also contends: the trial judge should have suppressed text messages found on the victim's cellphone that the prosecutor failed to provide in discovery until the eve of trial; the trial judge erred by denying defendant's request to instruct the jury that it could draw an adverse inference from the State's failure to call a witness whose statement to police was mentioned at the grand jury; the trial judge erred by not instructing the petit jury on passion/provocation manslaughter; and the trial judge imposed an excessive sentence. After carefully reviewing the record in light of the arguments of the parties and the applicable principles of law, we reject these contentions and affirm the convictions and sentence.

---

[1] We use initials to protect the privacy of the domestic violence victim and her loved ones. N.J.S.A. 2A:82-46; N.J.S.A. 2C:25-19(a)(1).

A-5010-18

We briefly recount the procedural history and the facts that are pertinent to the issues raised in this appeal. In June 2017, the prosecutor presented testimony to an Atlantic County grand jury from Detective Joseph Rauch, who had been assigned to investigate the shooting death of J.H. Detective Rauch testified that he obtained statements from several individuals whom defendant communicated with shortly after the shooting. Those witnesses—Lance Byard, Shamirah Dorsey, and Isaiah Seldon—were acquaintances of both defendant and J.H. Detective Rauch told the grand jury that defendant admitted to Seldon that defendant and J.H. had "got[ten] into a dispute, they were struggling and sustained—and the gun went off and she got shot." Defendant asked Seldon for transport out of Atlantic City. Seldon declined, telling defendant his vehicle "had problems."

Detective Rauch also testified that he took a statement from defendant's close friend and confidante, Stella Powell-Nixon, who stated that defendant had called her that night upset and crying. Powell-Nixon was able to pick out the words "Jackie," "hit," and "shoulder" from defendant's excited utterances. Detective Rauch testified that those words corresponded to the injuries J.H. sustained.

After presenting the detective's testimony, the assistant prosecutor asked the grand jury if they had any questions. The grand jurors declined to pose questions to the prosecutor and proceeded to return an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(2); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). The grand jury returned a separate indictment charging defendant with second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1).

Defendant thereafter moved to dismiss the indictment, contending the grand jury should have been presented with the option of charging defendant with the lesser offenses of aggravated manslaughter, reckless manslaughter, and passion/provocation manslaughter. On September 25, 2018, Judge John R. Rauh heard oral argument and denied the motion.

The trial was scheduled to start on April 8, 2019 before Judge Donna M. Taylor. On that day, the State informed the judge that it had recently been notified that police were in possession of J.H.'s cellphone. The police had overlooked the cellphone as a source of potential evidence until the State had

4

begun its trial preparation.[2]  According to the explanation of the assistant prosecutor assigned to the case, approximately one week before trial, as the State was interviewing its witnesses in preparation for trial, one witness (Keturah Foster) identified J.H.'s cellphone.  Recognizing its inadvertence, the State immediately applied for and obtained a communications data warrant (CDW) to extract data from the phone.  On the afternoon of April 2, 2019, the assistant prosecutor received a forensic report that included text messages that were stored on the phone.  The assistant prosecutor reviewed the records, deemed them to be relevant to the case, left a voicemail message for defense counsel that evening, and the next day emailed counsel a pdf copy of the text messages.  The

---

[2]  The prosecutor acknowledged at the April 8, 2019 hearing:

> I agree [the phone has] been in our possession.  Like I said, if we had realized the significance at the time it would have been investigated further. . . . It's not like this was happening by the same detective at the same time where this was recognized.  So while it was an oversight and it's not ideal, it's not any malicious intent on the part of the State, and again, I would have loved to have had this evidence two years ago.  So this is something that—it's not just people weren't doing their job.  The significance of the owner and identity of the person using this phone was not realized until substantive trial prep[aration], until it was confirmed by a witness, again, a witness who will testify in this courtroom later this week.

A-5010-18

assistant prosecutor also made several unsuccessful attempts to communicate with defense counsel by phone, email, and in-person. The assistant prosecutor finally spoke with counsel on April 5—the Friday before the Monday scheduled trial date—at which time she turned over a CD containing the data that had been extracted from the victim's phone.

At the April 8 hearing, Judge Taylor denied counsel's request to suppress the text messages based on their belated production in discovery. Instead, the judge granted a one-week continuance to permit defendant and his attorney an opportunity to review the material.

On April 15, 2019—the rescheduled date for the start of trial—defendant personally objected to the trial commencing, claiming that he had difficulty accessing the digital information and insufficient time to review the text messages. He also registered his dissatisfaction with his attorney's decision to not file a motion for a further continuance. The State refuted defendant's claim that he could not access the digital information, noting that it had provided defendant with a computer to review the text messages the State intended to introduce at trial. The State had also told defendant that it would assist him with viewing the material for "as long as the defendant needed." Judge Taylor found the State had made the information available to defendant and his counsel. She

A-5010-18

thereupon overruled defendant's personal objection and declined to adjourn the trial.

Defendant was tried over the course of five consecutive days, after which the jury returned guilty verdicts on the counts charging murder, unlawful possession of a handgun, and possession of a firearm for an unlawful purpose. Defendant waived his right to a jury trial for the bifurcated certain-persons charge. The court held a bench trial on May 30, 2019, finding defendant guilty of that offense.

We briefly summarize the evidence the State adduced at trial.

The State presented four witnesses—Keturah Foster, Lance Byard, Shamirah Dorsey, and Isaiah Seldon—who testified as to the acrimonious romantic relationship between defendant and the victim.

Keturah Foster testified she shared an apartment with defendant and J.H.—the same apartment in which J.H. was later found dead. Foster claimed she observed frequent arguments between defendant and the victim culminating in defendant moving out shortly before J.H.'s death. Foster testified the couple argued over whether defendant could take the mattress they shared. She heard defendant tell the victim: "That's my mattress. You won't have another n**** sleep on this mattress."

7

Foster also testified that at about 11:40 p.m. on the night of J.H.'s death, Foster saw defendant's Facebook post depicting "a gun, a box of Newport [cigarettes], weed, and a liquor bottle of Amsterdam green apple [vodka]" on defendant's lap. Since Foster was not in the apartment at the time, she asked J.H. via text message whether defendant was there with her. J.H. confirmed that defendant was in the apartment with her.

Lance Byard and Shamirah Dorsey, who lived together, testified they received a call from defendant on the night of the murder. They corroborated Keturah Foster's account that defendant and J.H. were undergoing relationship problems. On the night of the shooting, they were awoken by a call from defendant's close friend, Stella Powell-Nixon. Powell-Nixon alerted them that defendant had tried calling them to ask for assistance. Byard noted that he had a missed call from defendant at 3:06 a.m. Byard and Dorsey arranged for Isaiah Seldon to drive them to the victim's apartment. There, they discovered J.H. lying unconscious, under the mattress she and defendant had previously shared, with a gunshot wound on the side of her abdomen.

Isaiah Seldon testified that after he dropped Byard and Dorsey off at the apartment, he parked the car and entered the apartment. He also observed J.H. lying under the mattress. Seldon testified he then left the apartment and went to

8

defendant's known drug "stash house." There, he encountered defendant conferring with Stella Powell-Nixon. Seldon told defendant that he had come from the victim's apartment but did not ask defendant what happened. Seldon and defendant then "smoked a blunt." Defendant stated to Seldon, "I f***ed up" and "I know I did her in." Defendant then asked Seldon for a ride out of Atlantic City, but Seldon made up an excuse that his vehicle was inoperable.

The State introduced 114 text messages between defendant and the victim spanning from the early afternoon to the night of the murder. Those messages showed that defendant was upset that J.H. had a new lover. In a series of text messages between 1:46 p.m. to 3:59 p.m., defendant asked for the identity and location of J.H.'s new paramour so he could "shoot him in the face," claiming that

> [J.H.] violated [defendant], so somebody got to pay. And since it's not going to be [J.H.], that leaves [the other man]. Art of war, when violated one must strike with such savagery that those who violated will never think to do it again.

The State also played video surveillance footage from a nearby apartment complex showing that at 2:52 a.m., a large mattress-shaped object poked out of the victim's apartment and was then pulled back inside. The State also presented phone records showing that defendant had called 9-1-1 at 3:01 a.m.—hanging

9

up after two seconds—and again at 3:13 a.m. Defendant reported an alleged robbery and shooting at the victim's apartment, but again hung up when the 9-1-1 operator asked, "who has the gun."

The court sentenced defendant on the murder conviction to a fifty-year state prison term subject to NERA. The trial court merged the conviction for unlawful possession of a firearm for an unlawful purpose into the murder conviction. The court also imposed an eight-year prison sentence with a four-year term of parole ineligibility on defendant's conviction for unlawful possession of a firearm, and a seven-year prison term with a five-year period of parole ineligibility on the conviction for the certain persons offense. The court ordered that the sentences imposed on the weapons convictions were to run concurrently with each other and the sentence imposed on the murder conviction.

Defendant raises the following arguments for our consideration:

POINT I

DEFENDANT'S MOTION TO DISMISS THE INDICTMENT WAS IMPROPERLY DENIED.

POINT II

DEFENDANT WAS UNDULY PREJUDICED BY THE TRIAL COURT'S DECISION TO PERMIT THE STATE TO OFFER EVIDENCE OF TEXT

10

MESSAGES IN THE POSSESSION OF THE STATE, BUT NOT PROVIDED TO DEFENDANT IN DISCOVERY UNTIL THE EVE OF TRIAL.

POINT III

THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S REQUEST FOR AN ADVERSE INFERENCE JURY INSTRUCTION DUE TO THE STATE'S FAILURE TO CALL STELLA POWELL-NIXON AS A WITNESS.

POINT IV

THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S REQUEST TO INSTRUCT THE JURY AS TO PASSION/PROVOCATION MANSLAUGHTER.

POINT V

DEFENDANT'S SENTENCE OF FIFTY YEARS, SUBJECT TO THE NO EARLY RELEASE ACT IS MANIFESTLY EXCESSIVE.

II.

We first address defendant's contention the court erred in denying his motion to dismiss the indictment because the prosecutor failed to instruct the grand jury on lesser forms of homicide.[3] We begin our analysis by

_____

[3] The petit jury was instructed on the lesser-included offenses of aggravated manslaughter, N.J.S.A. 2C:11-4(a), and reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). The trial judge declined defendant's request to instruct the petit jury on passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2). We address

11                                                                A-5010-18

acknowledging the legal principles governing this appeal. The scope of our review is narrow. We review the trial court's determination of a motion to dismiss for a clear abuse of discretion. State v. Aloi, 458 N.J. Super. 234, 238 (App. Div. 2019) (citing State v. Ferguson, 455 N.J. Super. 56, 63 (App. Div. 2018)). An indictment is presumed valid, see State v. Perry, 124 N.J. 128, 167–68 (1991), and should not be dismissed unless "manifestly deficient or palpably defective," State v. Hogan, 144 N.J. 216, 229 (1996). See also State v. Tringali, 451 N.J. Super. 18, 27 (App. Div. 2017) ("A trial court should only dismiss an indictment on the 'clearest and plainest' grounds and only when it is clearly defective.") (quoting State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18–19 (1984)).

Furthermore, "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by the statute, the decision whether or not to prosecute, and what charge[s] to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." Perry, 124 N.J. at 168 (quoting Bordenkicher v. Haye, 434 U.S. 357, 364 (1978)). Moreover, "any error in the grand jury proceeding connected with the charging decision [is] harmless" in light of a petit jury's subsequent verdict of guilty as charged beyond

---

defendant's contention the petit jury should have been instructed on passion/provocation manslaughter in Section V, infra.

a reasonable doubt. United States v. Mechanick, 475 U.S. 66, 70 (1986); State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994).

Importantly for purposes of this appeal, "[a] lesser-included offense . . . need not be separately charged in the indictment." Warmbrun, 277 N.J. Super. at 60 (quoting State v. Mann, 244 N.J. Super. 622, 628 (App. Div. 1990)). Our Supreme Court recently affirmed this principle in State v. Bell, 241 N.J. 552, 566 (2020). In that case, the Court held:

> When the grand jurors' questions, considered in context, ask about lesser-included offenses and there is a rational basis for instructions on [those] lesser-included offenses, the better practice for prosecutors is to provide them and advise the grand jury that the trial court may include instructions on lesser-included offenses whether or not the grand jury authorizes them.
>
> [Ibid.]

The Court did not, however, establish a per se rule requiring grand juries to be given the option to charge lesser-included offenses. The Court carefully examined decisions of other state supreme courts, noting "[t]hose courts have generally found no affirmative duty [on the part of the prosecutor] to instruct on lesser-included offenses because of the discretion inherent in prosecutors' charging decisions." Id. at 563–64 (citing State v. Coconino Cnty. Super. Ct., 678 P.2d 1386, 1389 (Ariz. 1984); Cummiskey v. Super. Ct., 839 P.2d 1059,

1062 (Cal. 1992); Oxereok v. State, 611 P.2d 913, 917 (Alaska 1980); Commonwealth v. Noble, 707 N.E.2d 819, 822 (Mass. 1999)). The Court agreed with those decisions, ultimately concluding "the constitutional protections afforded defendants by the grand jury process are not undermined by the failure to charge lesser-included offenses." Id. at 565.

We agree with Judge Taylor that in this case, there was no affirmative duty for the prosecutor to present lesser-included offenses to the grand jury. Importantly, no members of the grand jury ever asked about such charges. In these circumstances, the decision to present the grand jury with lesser-included offenses rested in the discretion of the prosecutor. We see no abuse of prosecutorial discretion here. Nor did the trial judge abuse her discretion in denying defendant's motion to dismiss the indictment. We add that even assuming for the sake of argument that the grand jury should have been presented with the option to indict on types of homicide besides knowing/purposeful murder, any such error is harmless in light of the petit jury's subsequent guilty verdict on the murder charge after having been instructed on the lesser-included offenses of aggravated manslaughter and reckless manslaughter. See Mechanick, 475 U.S. at 70; Warmbrun, 277 N.J. Super. at 60.

14

## III.

We next address defendant's contentions related to the eleventh-hour discovery of the text messages the State introduced at trial. We begin by reaffirming the importance of full and timely discovery. Our Court Rules are designed to "assist defendants [in] mount[ing] a complete defense." State v. Smith, 224 N.J. 36, 48 (2016). "Rule 3:13-3 entitles defendants to broad discovery and imposes an affirmative duty on the State to make timely disclosure of relevant information." Ibid. (citing R. 3:13-3(b)(1)). "The rule also places a continuing duty on the State to provide discovery." Ibid. (citing R. 3:13-3(f)).

"A trial court's resolution of a discovery issue is entitled to substantial deference and will not be overturned absent an abuse of discretion." State v. Stein, 225 N.J. 582, 593 (2016). Rule 3:13-3(f) sets forth options for the trial court when confronted with a discovery violation. Specifically, the Rule provides,

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not

15

disclosed, or it may enter such other order as it deems appropriate.

As we recently emphasized in State v. Washington, "[a]n adjournment or continuance is a preferred remedy where circumstances permit." 453 N.J. Super. 164, 190 (App. Div. 2018) (quoting State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002)).  In contrast, "the sanction of preclusion is a drastic remedy and should be applied only after other alternatives are fully explored."  Ibid. (quoting State v. Scher, 278 N.J. Super. 249, 272 (App. Div. 1994)); accord Zaccardi v. Becker, 88 N.J. 245, 253 (1982) ("[A]lthough it is the policy of the law that discovery rules be complied with, it is also the rule that drastic sanctions should be imposed only sparingly.").

In Washington, we explained that when considering the appropriate remedy, a court must consider three factors:  "(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted[,] and (3) the absence of prejudice which would result from the admission of evidence."  453 N.J. Super. at 191 (citing State v. LaBrutto, 114 N.J. 187, 205 (1989) and State v. Zola, 112 N.J. 384, 418 (1988)).

Applying these factors to the case before us, we are convinced that a continuance, not suppression, was the appropriate remedy.  The record does not indicate that the State intended to mislead defendant.  This is not a situation

16

where the State conducted a forensic analysis of the contents of the victim's cellphone and withheld the results. The unexplained error was the failure by the State to examine the phone in police possession for evidence of communications between the domestic violence victim and defendant, which was made apparent only after one witness identified the victim's cellphone during trial preparation. This investigative oversight afforded no tactical advantage to the State. To the contrary, this gaffe delayed the State from obtaining relevant evidence and not just the defense. The record makes clear, moreover, that the prosecutor promptly disclosed the text messages to defense counsel once she became aware of them.

As to the element of surprise, the text messages revealed that the romantic relationship between defendant and the victim was troubled. That was hardly an unexpected revelation. The deteriorated nature of the domestic relationship was amply established by other evidence—the testimony of several acquaintances—that was disclosed in discovery in a timely fashion. Relatedly, defendant suffered no prejudice from the untimely disclosure of the text messages. As noted, other testimony presented by the State established that the romantic relationship had soured.

A-5010-18

Considering all these circumstances, we believe Judge Taylor did not abuse her discretion in concluding that a continuance was the appropriate remedy for the eleventh-hour disclosure of the text messages. We further conclude the one-week adjournment was sufficient to allow defense counsel and his client to review the text messages and address their introduction at trial. Defendant has not articulated how or why the defense response to the introduction of the text messages or the outcome of the trial would have been different had Judge Taylor granted defendant's personal request for another continuance.

IV.

Defendant contends the trial judge erred in refusing to give an adverse inference jury instruction—commonly referred to as a <u>Clawans</u>[4] charge—when the State at trial decided to not call a witness, Stella Powell-Nixon, whose hearsay statement had been presented to the grand jury. We conclude Judge Taylor did not abuse her discretion in rejecting defendant's request for the adverse inference instruction.

During the State's grand jury presentation, a detective related a portion of a statement that Powell-Nixon had given to police regarding a phone call she

---

[4] <u>State v. Clawans</u>, 38 N.J. 162, 170 (1962).

18

received from defendant after the shooting. She stated that defendant was crying and used the words "Jackie," "hit," and "shoulder." The detective testified that those words corresponded to the injuries the victim sustained. Defendant argued Powell-Nixon's testimony was necessary either to corroborate or contradict Isaiah Seldon's testimony that defendant told him "I know I did her in." In responding to defendant's motion for a Clawans charge, the prosecutor explained that Powell-Nixon had not been cooperative or truthful with the State, and that the State was unable to locate her after she gave the statement to the detective in 2018.

A party seeking a Clawans charge must first "state the name of the witness . . . not called and must set forth the basis for the belief that the witness . . . [has] superior knowledge of relevant facts." Washington v. Perez, 219 N.J. 338, 356 (2014) (alterations in original) (quoting State v. Hill, 199 N.J. 545, 560–61 (2009)). Secondly, the trial court must determine that an adverse inference charge is appropriate in light of its findings with respect to four factors:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate

relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.

[Hill, 199 N.J. at 561–62.]

Defendant has not cited any authority for the proposition that a defendant is automatically entitled to a Clawans charge when the State decides not to call a witness whose hearsay statement was presented to a grand jury. We therefore apply the analysis set forth in Hill.

Judge Taylor found that Powell-Nixon had a special relationship with defendant, not the State. The judge also accepted the State's representation that it made reasonable but unsuccessful efforts to contact Powell-Nixon after she provided her initial statement to police in 2018. More importantly, Judge Taylor found that defendant failed to demonstrate that Powell-Nixon's testimony was "superior" to that of another witness, Isaiah Seldon, who testified at trial that defendant admitted to him the night of the victim's death that he "did her in." The judge also accepted the State's representation that Powell-Nixon was uncooperative, untruthful, and biased in defendant's favor. We have no basis upon which to overturn Judge Taylor's thoughtful and well-articulated findings with respect to the relevant factors.

# V.

We turn next to defendant's contention the trial judge erred by refusing to charge the jury on passion-provocation manslaughter. That crime "occurs when a homicide which would otherwise be murder . . . is 'committed in the heat of passion resulting from a reasonable provocation.'" State v. Galicia, 210 N.J. 364, 378–79 (2012) (quoting N.J.S.A. 2C:11-4(b)(2)). "[T]he passion sufficient to sustain a passion/provocation manslaughter verdict must disturb a defendant's reason," must "deprive[] the killer of the mastery of understanding, [and must be] a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed." State v. Pitts, 116 N.J. 580, 612 (1989).

Passion/provocation manslaughter has four elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." State v. Josephs, 174 N.J. 44, 103 (2002) (citing State v. Mauricio, 117 N.J. 402, 411 (1990)); Galicia, 210 N.J. at 379–80. "The first two criteria are objective, the other two subjective. If a slaying does not include all of those elements, the offense of passion/provocation manslaughter cannot be demonstrated." Mauricio, 117 N.J. at 411.

A-5010-18

"As to the first element, the provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." State v. Carrero, 229 N.J. 118, 129 (2017) (internal quotation marks omitted) (quoting Mauricio, 117 N.J. at 413). "Words alone are insufficient to create adequate provocation, but the presence of a gun or knife can satisfy the provocation requirement." Ibid. (citations omitted). "With respect to the second element, the cooling-off period, we have recognized that 'it is well-nigh impossible to set specific guidelines in temporal terms.'" Ibid. (quoting Mauricio, 117 N.J. at 413). "[I]n a murder prosecution, . . . the State bears the burden of proving the inadequacy of any provocation." Mauricio, 117 N.J. at 412 (citing State v. Grunow, 102 N.J. 133, 145 (1986)).

We next consider the general legal principles governing when a trial judge should instruct a jury on a lesser offense than the crime for which the defendant was indicted. N.J.S.A. 2C:1-8(e) provides, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." An appellate court reviews the denial of a defendant's request for a lesser-included offense instruction by "determining whether 'the evidence presents a rational basis on which the jury could (1) acquit the defendant of the greater charge and (2) convict the defendant

of the lesser.'" Carrero, 229 N.J. at 128 (2017) (quoting State v. Brent, 137 N.J. 107, 117 (1994)). "If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Ibid.

Our application of these general principles to the circumstances presented in the domestic violence case before us is guided by our decisions in State v. Darrian, 255 N.J. Super. 435 (App. Div. 1992), and State v. McClain, 248 N.J. Super. 409 (App. Div. 1991). In Darrian, we rejected the defendant's argument that "the jury could have found from the evidence that he killed the victim in a jealous rage after an argument about their relationship led to 'mutual combat.'" 255 N.J. Super. at 447. Notwithstanding Darrian's statement that he "had argued and fought" with the victim before raping and killing her, we noted that the lack of evidence of physical combat precluded a finding of sufficient provocation. Id. at 448 ("It is generally accepted that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter.") (citing Mauricio, 117 N.J. at 413).

Likewise, in McClain, we held that a passion/provocation instruction was unavailable to a defendant charged with shooting her lover "because she was tired of him 'cheating' on her." McClain, 248 N.J. at 414. In both Darrian and McClain, the defendants suspected or knew that their romantic partners had been

23                                                                      A-5010-18

unfaithful. That was not sufficient, however, to justify a passion/provocation charge. Rather, we found it dispositive in those cases that "there was an absence of either physical abuse or threat of physical harm within any reasonable period of time prior to the murder." Ibid.

As in Darrian and McClain, defendant in the present case expressed consternation that the victim slept with another man. Also as in Darrian and McClain, there is no evidence of any physical altercation between defendant and the victim that might constitute a legally sufficient provocation for him to shoot her. Furthermore, the text messages between defendant and the victim spanned nearly ten hours from their initial text message exchange at 3:59 p.m. to the shooting that occurred around 2:52 a.m. that night. That interval provided more than an objectively reasonable amount of time for defendant to "cool off." Accordingly, we conclude defendant has not met the first two objective prerequisites for a passion/provocation instruction. Judge Taylor therefore properly denied defendant's request for that instruction.

## VI.

Finally, we address defendant's contention the sentence imposed on his murder conviction is excessive. We begin our analysis by emphasizing that our

24

role in reviewing a sentence imposed by a trial judge is limited. State v. L.V., 410 N.J. Super. 90, 107 (App. Div. 2009). We review only

> (1) whether the exercise of discretion by the sentencing court was based upon findings of fact grounded in competent, reasonably credible evidence; (2) whether the sentencing court applied the correct legal principles in exercising its discretion; and (3) whether the application of the facts to the law was such a clear error of judgment that it shocks the conscience.
>
> [State v. Megargel, 143 N.J. at 493 (citing State v. Roth, 95 N.J. 334, 363–65 (1984)).]

N.J.S.A. 2C:11-3(b)(1) provides in pertinent part that a defendant convicted of murder must be sentenced either to a thirty-year prison sentence with a thirty-year period of parole ineligibility, or "to a specific term or years which shall be between 30 years and life imprisonment." For purposes of calculating parole eligibility, a "life" sentence is equivalent to a custodial term of seventy-five years. See State v. Manzie, 168 N.J. 113, 115 (2001) (Stein, Coleman, and Zazzali, JJ., concurring). Accordingly, a fifty-year prison term falls within the range of sentences that may be imposed on a murder conviction.

Judge Taylor carefully applied the applicable aggravating and mitigating factors. She found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk defendant would commit another offense), aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the extent of the defendant's criminal history), and aggravating

25

factor nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterring the defendant and others from violating the law). She accorded substantial weight to aggravating factor three because defendant's "life of crime and unemployment" and "escalating" criminal behavior demonstrated he would likely reoffend. She accorded significant weight to aggravating factor six because of defendant's long history of criminality as both a juvenile and adult. She also accorded substantial weight to aggravating factor nine, noting defendant's crime was "call[o]us and senseless."

Judge Taylor found that there were no mitigating factors. Although defendant argued that the victim's relationship with another man supported a finding for mitigating factor three ("[t]he defendant acted under a strong provocation"), the judge rejected this argument and noted there was no evidence in the record suggesting any such strong provocation. Defendant points to State v. Flores, 228 N.J. Super. 586, 591 n.1 (App. Div. 1988), where we recognized in dicta the proper exercise of the sentencing judge's discretion in deeming "the victim's meretricious relationship with defendant's wife" as sufficiently strong provocation to find mitigating factor three. We did not, however, suggest that mitigating factor three applies when a person convicted of murdering his on-and-off girlfriend becomes upset because she started a romantic relationship

with another person. We do not believe Judge Taylor abused her discretion in declining to find that defendant's jealous rage was provoked for purposes of the mitigating factor. Indeed, it would be inconsistent with the undergirding purpose of the Protection of Domestic Violence Act (PDVA) to suggest J.H. provoked her own demise by starting a new relationship. See N.J.S.A. 2C:25-18 ("The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured[,] and in some cases even killed by their spouses or cohabitants . . . .").

The judge concluded that "the [a]ggravating [f]actors so clearly and substantially outweigh the absence of [m]itigating factors, a sentence beyond the mandatory minimum of [thirty] years [for murder was] necessary." We agree. The fifty-year term falls within the allowable range of sentences and in no way shocks the judicial conscience. Roth, 95 N.J. at 364–65.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION