**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0913-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOSE GUADALUPE,

    Defendant-Appellant.

_____

Submitted January 22, 2025 – Decided February 4, 2025

Before Judges Perez Friscia and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 17-08-2162 and 17-08-2209.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Kevin Hein, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jose Guadalupe appeals from the November 1, 2023 Law Division order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. Defendant contends an evidentiary hearing is warranted because he sufficiently demonstrated a prima facie showing of ineffective assistance of counsel (IAC) based on his trial counsel's failure to request a passion/provocation manslaughter charge. We affirm.

I.

We incorporate the facts and procedural history set forth in our prior opinion, State v. Jose Guadalupe, No. A-3945-18 (App. Div. Nov. 10, 2021) (slip op. at 1-33), affirming defendant's convictions and sentence on direct appeal. We only recite the pertinent facts to the present appeal.

In the early evening of April 23, 2017, officers responded to a report of gunshots near the intersection of North 18th Street and Pierce Street in East Camden. In the neighborhood was "a housing complex, a church, a learning academy, a salvation army center, and residential dwellings." Guadalupe, slip op. at 4. The officers observed "a silver Mazda Protege crashed against a fence in a field at the dead-end of North 18th Street." Ibid. After approaching the vehicle, the officers discovered the Mazda's engine was running, and the driver was buckled in his seat, "unconscious[,] and suffering from several gunshot

A-0913-23

wounds." Ibid. The officers also observed the vehicle's shattered driver-and passenger-side windows and bullet casings around the vehicle.

Officers transported the victim in a police vehicle to the hospital, where he was pronounced dead. "An autopsy revealed the victim suffered seven gunshot wounds to his right temple, right and left sides of his chest, right arm, right forearm, left forearm, and left elbow." Id. at 4-5. After the autopsy, the medical examiner determined the manner of the victim's death was homicide.

During the investigation of the crime scene, police recovered "a cell phone from the floor of the driver's side of the Mazda, seven shell casings, and a black and yellow glove located in the brush of the field on North 18th Street." Id. at 5. The State's firearms expert determined the shell casings "were .40 caliber and discharged from the same firearm." Ibid. A detective assigned to the homicide investigation determined the glove to be "one commonly used to ride motorcycles and dirt bikes." Ibid. The State's DNA forensic expert opined the DNA profile evidence recovered from the glove was "inconclusive," and a DNA profile was not obtainable from the shell casings.

Detectives extracted from the victim's cell phone "text messages between the victim and a person named 'Whip'" sent on the day of the shooting. Ibid. In the exchanged text messages, the victim also identified Whip as "Jav."

Detectives later identified Whip as Jabriel Rosa. At 3:07 p.m., "Whip and the victim arranged to meet at Whip's mother's house, which was corroborated by surveillance video." Ibid. The victim's fiancé recalled that on the day of the shooting, "at around 6:30 p.m., the victim received a phone call from [Rosa]" and immediately left to meet him. Id. at 6.

"Text messages from the victim's phone sent at 6:03 p.m. and 6:08 p.m. indicated that the victim and [Rosa] would meet at their 'spot.'" Ibid. At 6:40 p.m., the victim texted Rosa asking where he was and confirming he was at their meeting spot. "At the time these text messages were sent, surveillance video captured an individual riding a red and yellow quad driving in the direction of the shooting and making a turn at the intersection of North 18th Street and Pierce Street." Id. at 7.

On April 24, detectives interviewed defendant. After receiving and waiving his Miranda[1] rights, defendant acknowledged hearing "about the homicide one day earlier." Ibid. He maintained that on the day of the shooting, he worked at a garage shop in Brooklawn, leaving only for a short time in the early afternoon and later in the evening to travel to his girlfriend's house in Paulsboro for dinner. He advised the detectives that when he returned to the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0913-23

shop, he worked until the early morning and fell asleep in a car there.  Defendant "claimed that he did not know the victim" and had met Rosa as a shop customer but came to consider him like "family."  Ibid.

On May 11, detectives interrogated defendant a second time after he waived his Miranda rights.  The detectives told defendant they:  did not believe he was being honest about his involvement in the homicide; had accumulated incriminating evidence from the shooting; and "kn[e]w [defendant] killed [the victim]."  Id. at 8.  A detective "explained to defendant there were 'numerous videos' and 'multiple witnesses' [showing] that defendant was riding the red and yellow quad."  Ibid.  He also "told defendant a riding glove was discovered at the crime scene, and defendant confirmed the glove was his."  Ibid.

After defendant requested to see his girlfriend, which the detectives accommodated, he confessed.  Defendant explained to his girlfriend, who had suggested he speak with an attorney, that "[t]here[ is] no getting out of it, to tell a lawyer.  I[ am] just going to make it through with them, I'm go[ing to] tell them about things, you know, and I[ am] just going to take it from there."

Defendant became emotional and cried after she left, explaining to detectives that he shot the victim.  In the surveillance video the detectives played, he identified himself as the individual at "the intersection of Third Street

5

and Royden Street on the day of the shooting at 7:48 p.m." and "as the individual wearing black pants and gray sneakers." Id. at 10. "Defendant described the route he took to the location of the homicide, naming the intersections he passed, which was corroborated by surveillance video." Id. at 10-11. He recounted parking his quad near the location and waiting for the victim to confirm he was parked before approaching the victim's vehicle. "Defendant recalled observing two kids riding their bicycles while he waited," which detectives later corroborated by watching recovered surveillance video. Id. at 11. Further, defendant explained that for drug deals, he "always carr[ied] a gun . . . when [h]e mov[ed] the transaction."

He told the detective that because Rosa owed the victim money, defendant believed the victim might shoot him. Defendant was buying "some stuff" from the victim, which he had no money to pay for. After approaching the victim's vehicle, he observed the bag he was supposed to retrieve on the front passenger seat and believed the victim reached for something. He fired several shots at the victim, discharging all the rounds in his handgun before running away. While defendant maintained he feared the victim would harm him, he stated to detectives, "I[ am] not saying [the victim] pulled out a gun on me or in self-defense[.] I did it."

Thereafter, "[a]t trial, defendant recanted his confession." Id. at 13. "He testified that he did not shoot the victim, did not know who shot the victim, did not see the victim on April 23, 2017, and did not own a handgun." Ibid. He refuted being the individual in the relevant surveillance videos. Defendant alleged he learned the specific details that he recounted to police from the conversations he overheard between Rosa and other individuals discussing the killing. Defendant "described an incident a week before his confession, where he was on his way to the liquor store when two individuals wearing face masks and black clothes from top to bottom began punching and kicking him." Id. at 14. He maintained the unknown assailants "covered in . . . face mask[s]" placed a gun to his head and threatened that he better do what he was told or he would "see what[ was] going to happen to [him] and [his] family."

Defendant testified he lied in his May confession because Rosa and others had threatened to harm him and his family if he did not "take the blame," and defendant tried to credibly persuade the detectives he killed the victim. He explained he later decided to tell the truth because his family was in Puerto Rico, and no family members resided in New Jersey. He acknowledged having three prior convictions but explained they were all drug related.

A-0913-23

On November 7, 2018, a jury found defendant guilty of: first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1).

On February 1, 2019, defendant pleaded to one count of second-degree possession of a firearm while committing a controlled dangerous substance (CDS) or bias crime, N.J.S.A. 2C:39-4.1(a). In August 2017, a separate grand jury indictment charged defendant and Rosa with: third-degree possession of a CDS, N.J.S.A. 2C:35-10(a)(1) (counts one and three); third-degree possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1), (b)(3) (count two); first-degree possession with intent to distribute, N.J.S.A. 2C:35-5(b)(1) (count four); third-degree possession with intent to distribute CDS within 1,000 feet of a school, N.J.S.A. 2C:35-7 (count five); two counts of second-degree possession of a handgun in the course of a CDS offense, N.J.S.A. 2C:39-4.1(a) (counts six and seven); first-degree maintaining or operating a CDS production facility, N.J.S.A. 2C:35-4 (count eight); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1) (count ten).

After the sentencing court copiously addressed the aggravating and mitigating factors pursuant to N.J.S.A. 2C:43-2(e), as well as the Yarbough[2] factors, it sentenced defendant to an aggregate thirty-five-year term of imprisonment. The court sentenced defendant on the aggravated manslaughter count to a term of twenty-five years in prison subject to the No Early Release Act, N.J.S.A. 2:43-7.2, and on the certain persons not to possess weapons count to a consecutive ten-year term of imprisonment with a five-year period of parole ineligibility. In accordance with defendant's negotiated plea, it sentenced defendant on the second-degree possession of a firearm while committing a CDS offense to a concurrent five-year term of imprisonment.

Defendant filed a direct appeal challenging the trial court's: denial of his motion to dismiss; denial of his motion for a judgment of acquittal; failure to instruct the jury on imperfect self-defense; and imposed aggregate sentence. Id. at 3. Unpersuaded by defendant's arguments, we affirmed his convictions and sentence. Id. at 1-33. On January 31, 2022, the Supreme Court denied defendant's petition for certification.

On June 1, defendant filed a self-represented PCR petition, which PCR counsel thereafter supplemented. Defendant argued IAC because his trial

---

[2] State v. Yarbough, 100 N.J. 627, 642-44 (1985).

A-0913-23

counsel failed to: "seek a passion[/]provocation jury instruction based on the particular facts of [this] case"; and "ensure that the plea [to possession of a firearm while committing a CDS offense] occurred simultaneously with sentencing," which resulted in the sentencing court using defendant's plea to justify imposition of an excessive sentence.[3]

After hearing argument, the PCR Judge Yolanda C. Rodriguez issued an order accompanied by a thorough oral decision denying defendant's petition. The judge addressed defendant's petition under the PCR framework established under the court rules and the two prong IAC test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984), as adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987). The judge found defendant's IAC claim challenging trial counsel's failure to request a passion/provocation jury charge was barred under Rule 3:22-5, as defendant had raised "a substantially similar" issue on direct appeal regarding the trial court's failure to charge on imperfect self-defense. After noting the similarities between passion/provocation and

---

[3] On appeal, defendant does not challenge the PCR judge's finding that he failed to make a prima facie showing of IAC regarding his plea to possession of a firearm while committing a CDS offense prior to his aggravated manslaughter and certain persons sentencing. We note the sentencing court imposed the negotiated recommended plea sentence of a five-year concurrent term of imprisonment.

imperfect self-defense, the judge concluded defendant's PCR petition was barred because we had concluded on direct appeal that the trial court permissively did not charge imperfect self-defense and affirmed his conviction.

In addressing defendant's PCR argument on the merits, the judge found his bald IAC claims were insufficient. She concluded his allegation that trial counsel failed to request a passion/provocation manslaughter charge did not warrant an evidentiary hearing because it directly conflicted with his defense. The judge explained that defendant maintained he "was[ no]t present" at the shooting "and did not shoot and kill the victim." Therefore, a jury charge on passion/provocation manslaughter, which would have required instruction on whether defendant had reasonable provocation, would have weighed against his chosen defense strategy of not being at the scene. The judge found defendant failed to satisfy either prong of <u>Strickland</u>, as he did not demonstrate trial counsel's deficiency or prejudice.

On appeal, defendant raises a single point for our consideration:

> <u>POINT I</u>
>
> THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A <u>PRIMA</u> <u>FACIE</u> CASE OF TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO REQUEST A

PASSION/PROVOCATION MANSLAUGHTER
CHARGE.

II.

In the absence of an evidentiary hearing, we review de novo the factual inferences drawn from the record by the PCR court as well as the court's legal conclusions. State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020). A petitioner is not automatically entitled to an evidentiary hearing by simply raising a PCR claim. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). "A prima facie case is established when a defendant demonstrates 'a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting R. 3:22-10(b)). If defendant's "allegations are too vague, conclusory, or speculative," they are not entitled to an evidentiary hearing. Ibid. (quoting State v. Marshall, 148 N.J. 89, 158 (1997)).

To succeed on an IAC claim, a defendant must satisfy both prongs of the test set forth in Strickland, 466 U.S. at 687, as adopted by Fritz, 105 N.J. at 58, by a preponderance of the evidence. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

12

defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. A trial court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Under the second prong of the Strickland test, the defendant must show "the deficient performance prejudiced the defense." Id. at 687. This means "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Ibid. It is insufficient for the defendant to show the errors "had some conceivable effect on the outcome." Id. at 693.

## III.

Defendant first contends that his claim of IAC by trial counsel for failing to request a passion/provocation manslaughter charge is not procedurally barred under Rule 3:22-5. He specifically argues the PCR judge "erred by equating passion[/]provocation manslaughter with imperfect self-defense" and by finding our adjudication of defendant's imperfect self-defense challenge on the merits was substantially similar. We disagree.

Previously adjudicated PCR claims are procedurally barred. R. 3:22-5. "A prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule . . . or in any appeal taken from such proceedings." Ibid. A PCR petition "is not a substitute for direct appeal; nor is it an opportunity to relitigate a case on the merits." State v. Szemple, 247 N.J. 82, 97 (2021); see also State v. Preciose, 129 N.J. 451, 459 (App. Div. 1999). Further, a PCR claim is barred "if the issue raised is identical or substantially equivalent" to an issue adjudicated previously on direct appeal. State v. Afanador, 151 N.J. 41, 51 (1997) (italicization omitted) (quoting State v. McQuaid, 147 N.J. 464, 484 (1997)).

On direct appeal, after considering defendant's argument that the trial court should have instructed the jury on imperfect self-defense, we discerned no error. We reviewed defendant's challenge in the context of the established meaning of imperfect self-defense. Our Supreme Court has explained the meaning of imperfect self-defense as "an honest subjective belief on the part of the killer that his or her actions were necessary for his or her safety, even though an objective appraisal by reasonable people would have revealed not only that the actions were unnecessary, but also that the belief was unreasonable." State

14

v. Bowens, 108 N.J. 622, 628 (1987). Further, "[t]he predicate for such an instruction . . . is that such evidence . . . demonstrates acts of provocation on the part of the victim to an extent sufficient to afford the jury a rational basis for convicting the defendant of one of the Code's forms of manslaughter." State v. Pitts, 116 N.J. 580, 606 (1989). Accordingly, we concluded that defendant demonstrated no "rational basis for a charge of imperfect self-defense."

Relevant to defendant's IAC contention is the definition of passion/provocation manslaughter. New Jersey has defined passion/provocation manslaughter as "[a] homicide which would otherwise be murder . . . [but] is committed in the heat of passion resulting from a reasonable provocation." State v. Carrero, 229 N.J. 118, 128 (2017) (alterations in original) (quoting N.J.S.A. 2C:11-4(b)(2)). The four elements of passion/provocation manslaughter are that: "[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying." Id. at 129 (alterations in original) (quoting State v. Mauricio, 117 N.J. 402, 411 (1990)). To satisfy the first element, "the provocation must be sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." Ibid. (alterations

A-0913-23

in original) (quoting Mauricio, 117 N.J. at 412) (internal quotation marks omitted). Our Court has determined the presence of a weapon may be sufficient to support the provocation requirement, while harsh words and "a bump" by a victim are insufficient. See Mauricio, 117 N.J. at 414.

After considering the imperfect self-defense and passion/provocation manslaughter factors, we concur with the PCR judge that defendant's IAC claim is substantially equivalent to his imperfect self-defense claim previously adjudicated on direct appeal. We therefore discern no reason to disturb Judge Rodriguez's well-supported determination that defendant's IAC claim regarding trial counsel's failure to seek a passion/provocation manslaughter charge is procedurally barred as substantially similar. We note defendant's PCR claim is also barred under Rule 3:22-4, because it could have been raised on direct appeal.

For the sake of completeness, we address defendant's IAC claim on the merits. While it is undisputed defendant testified that he was not at the scene of the homicide and did not shoot the victim, he contends an evidentiary hearing is warranted because he has made a sufficient prima facie showing of IAC based on trial counsel's failure to request a passion/provocation manslaughter charge. We recognize that pursuant to N.J.S.A. 2C:1-8(e), "The [trial] court shall not

charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Defendant has recited no material facts in the record supporting a rational basis for a passion/provocation jury verdict. See R. 3:22-10(b) (stating a defendant is only entitled to an evidentiary hearing "upon the establishment of a prima facie case in support of [PCR], a determination by the court that there are material issues of disputed fact . . . , and a determination that an evidentiary hearing is necessary to resolve the claims for relief").

While we acknowledge defendant could have presented inconsistent alternate defenses, he has failed to proffer sufficient facts for the jury's consideration under the first passion/provocation prong—that the victim adequately provoked him—and the third prong—that "the provocation must have actually impassioned" him. Stated another way, defendant has not demonstrated material facts showing that trial counsel was deficient for failing to request a passion/provocation manslaughter charge.

Defendant's reference to his confession played for the jury, wherein he stated he observed the victim reaching for something, is insufficient. Setting aside defendant's trial testimony, defendant admitted that he always carried a weapon to CDS transactions because drug dealing was dangerous. He also

admitted going to the drug exchange to meet the victim without money and knowing that would place him in potential danger. Notably, defendant confessed to shooting the victim "because [he] was[ not] thinking" and not because the victim "pulled out a gun on [him] or in self-defense."

In sum, after reviewing defendant's argument in light of the record, we conclude the PCR judge did not err in finding that defendant offered no predicate facts supporting IAC by trial counsel for failing to request the passion/provocation manslaughter charge, as it was inconsistent with defendant's strategy and defense that he did not shoot the victim, and the charge was unsupported by the evidence. Defendant has only made bald assertions. Thus, he is not entitled to an evidentiary hearing because he has not "presented a prima facie [case] in support of [PCR]," Marshall, 148 N.J. at 158 (first alteration in original) (italicization omitted) (quoting Preciose, 129 N.J. at 462), meaning he did not demonstrate a deficient performance by trial counsel and "demonstrate a reasonable likelihood that his . . . claim will ultimately succeed on the merits." Ibid.

To the extent we have not addressed defendant's remaining arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

18

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-0913-23